*In re* Doolittle and another, Strikers.[1]

*(Circuit Court, E. D. Missouri. March 18, 1885.)*

**1. Receivers—Interference with Property by Strikers—Contempt.**

Where the employes of a railroad company, whose property is not in the custody of this court, by concert of action quit work and take possession of and obstruct the movement of engines and cars on the tracks of said company, and while so doing also take possession of or obstruct the operation of engines or cars in the custody of receivers of this court, it is the right and duty of the court to punish such latter acts as contempts of its authority.

**2. Same—Distinction between Lawful and Unlawful Purpose of Parties Interfering.**

If a party engaged in a lawful undertaking unintentionally interferes with or obstructs the officers of this court in the discharge of their duties, the court is not tenacious of its prerogative; but it is otherwise where parties, while engaged in an unlawful act, obstruct the officers of this court, although intending no contempt.

[1]Reported by Edwin G. Merriam, Esq., of the St. Louis bar.

3. SAME—DUTY OF STRIKERS TO APPLY TO COURT.

This court is open to hear any just ground of complaint against its receivers. Employes of the receivers may present their grievances, and the court will instruct its officers in the premises. For this reason the court will be prompt to punish men who interfere with its receivers in the custody and control of property committed to them by law.

4. SAME—INTIMIDATION OF EMPLOYES BY STRIKERS—"REQUESTS" EQUIVALENT TO THREATS.

A simple "request" to do or not to do a thing, made by one or more of a body of strikers under circumstances calculated to convey a threatening intimidation, with a design to hinder or obstruct employes in the performance of their duties, is not less obnoxious than the use of physical force for the same purpose. A "request" under such circumstances is a direct threat and an intimidation, and will be punished as such.

In the Matter of the Order on Edward Doolittle and William Schanbacher to show cause why they should not be punished for contempt in interfering with property in the hands of the receivers of this court.

The marshal reported to the court that at Hannibal, Missouri, he found the possession and use of property in the custody of the receivers of the Wabash, St. Louis & Pacific Railway, heretofore appointed by this court, interfered with by bodies of men, who prevented the agents and employes of said receivers from operating portions of said property by spiking and blocking the tracks, drawing water from engines, inciting the agents and employes of the receivers to quit work, and threatening them with violence if they continued in the service of the receivers; that he gave warning that all persons interfering with property in the custody of this court would be arrested and punished. He further reported that, in particular, one Edward Doolittle had, on the tenth day of March, 1885, prevented James W. Ritchie, a train-master of the said Wabash Railway, from taking out of a roundhouse a number of engines in the custody of the receivers, although notified that these engines belonged to the Wabash Railway. Doolittle was reported to be a recognized leader of persons engaged in the unlawful acts as above stated. The marshal accordingly caused him to be arrested. And, further, that on the twelfth day of March he arrested one John Schanbacher for holding an engine upon and for the purpose of blocking the main track over which Wabash trains are run into the city of Hannibal. Schanbacher was previously warned that he was interfering with property in the custody of this court, but he disregarded the warning, and interposed his person between the marshal and the engine, saying he would not let the engine go down the road; whereupon the arrest was made. Schanbacher was also alleged to be an active leader of the "strike" then in progress.

The report of the marshal as to the acts of Doolittle was supported by the affidavit of James W. Ritchie, a train-master of the Wabash Railway, as before stated, which affidavit showed that the engines and freight cars of the Wabash Railway, the movement of which Doolittle obstructed, were at the time in the yards of the Missouri Pacific Railway Company, certain of whose employes it seems were then engaged in a "strike." The affiant stated:

v.23F,no.11—35

"I said to him, [Doolittle,] 'I understand that you object to my moving these engines and this freight. How is this, when your friends and associates have consented?' He replied: 'We have a point to make on this.' I told him to make his point where it belonged, and not on us. I told him this was Wabash freight, and the Wabash had nothing to do with this strike in any shape or form. He replied they were good ornaments. I asked him to get into a car and talk this matter over with me, and he said it was too rich for his blood; and I then asked him to walk down the track with me, and he said he had not time."

The result was that the movement of the 9 Wabash engines and about 100 cars of freight was delayed some hours. The prisoners, Doolittle and Schanbacher, were accordingly ordered to show cause why they should not be attached and punished for contempt of court, for their interference with property in the possession of the receivers. They filed a reply in writing, alleging that they had not at any time been knowingly or willfully in contempt of this court or its officers, or intentionally obstructive of the decrees, orders, or process of the court; but, on the contrary, had intended to regard and obey the orders of the court so far as they knew or understood them. As to the detention of the nine engines in the Hannibal yards, they alleged that the train-master of the Wabash Railway "cordially" agreed to a delay of several hours, until Doolittle could obtain advice by telegraph from "our headquarters" at Sedalia. Also, that there being a difference of opinion as to which railroad the freight belonged to, it was "harmoniously settled" between the train-master and the strikers that it should be left where it was; that no violence, intimidátion, or threats were used towards the engineers, or any one else, but that the engineers were unwilling to go out without the full consent of the strikers; and thus the engineers were detained by the strikers, of whom Doolittle admitted that he was one, and also that he acted as their "spokesman." Doolittle denied that he had participated in spiking the track, drawing water from engines, or that he had any previous knowledge that such acts were contemplated. Schanbacher admitted that he "objected" to the marshal taking the engine to a side track, but alleged that he did so hastily, and without appreciating the marshal's authority, and a moment later called to the engineer to go onto the side track, when some one in the crowd cried out not to do it. In conclusion, both Doolittle and Schanbacher reiterated that they did not at any time use threats or violence against any person, whether marshal or other person. They admitted that their "zeal in the cause" might have led them to commit acts capable of being construed as in contempt of this court, but averred that such contempts were without willfulness, malice, or intent on their part.

*Charles C. Allen,* for respondents, Doolittle and Schanbacher.

BREWER, J., *(orally.)*[1] The facts in reference to this case are very

---

[1] The opinions of Judges BREWER and TREAT as here published were reported by Mr. L. L. Walbridge, stenographer of the court, and copy of same was submitted to the judges for revision previously to this publication.

obvious. It does not appear that these defendants in the first instance started out to obstruct the receivers in their management of the road. In some way they had ascertained that the road was in possession of the receivers appointed by this court, and that it was not prudent to interfere with them. But it is clear that, while engaged in a strike against the Missouri Pacific Railroad, they did interfere with the management of the engine and freight cars under the control of such receivers, and did obstruct such receivers in carrying on the business of the road placed in their charge by this court. Now, while in one sense they cannot be charged with contempt in that they intended to obstruct this court and its officers in the discharge of its and their duty, yet they placed themselves in this attitude: They engaged in an unlawful enterprise, and while so engaged they did interfere with the officers of this court in the management of the road which was in their hands as receivers. Now, if a party engaged in a lawful undertaking unintentionally interferes with some of the officers of this court, and obstructs them in the discharge of their duties, this court is not tenacious of any mere prerogative, and would let such action pass almost without notice; but where parties are engaged in that which is of itself unlawful, in doing that which they have no right to do, and in so doing obstruct the officers of this court, although intending no contempt, that is a very different thing.

Suppose a party of men—and I state this merely as an illustration—combine to commit an assault and battery upon one person, and, without intending so to injure, do, through mistake, actually seize and beat a third person. Although such beating was unintentional, perhaps accidental, yet, as they were engaged in an unlawful enterprise, it is just the same as though they intended that unlawful attack upon the person actually receiving the injury. And so, here, though these defendants did not set out to obstruct the officers of this court, and the receivers of the Wabash Company, in their administration of that property, yet they did set out to obstruct some persons in the exercise of their legal rights; they did set out to do that which they had no right to do; and this court is justified, indeed, it is its duty, inasmuch as they did obstruct the officers of this court, to regard it just the same, or nearly the same, as though they started out to obstruct the officers of this court, the receivers of the Wabash Railway Company.

*Mr. Charles C. Allen.* Do I understand your honor to say that the act of striking—merely carrying out of the strike—was unlawful?

*The Court,* (Judge BREWER.) It is not the mere stopping of work themselves, but it is preventing the owners of the road from managing their own engines and running their own cars. That is where the wrong comes in. Anybody has a right to quit work, but in interfering with other persons' working, and preventing the owners of railroad trains from managing those trains as they see fit—there is where the wrong comes in.

I believe Judge DRUMMOND, in a series of cases that came before him, across the river in Illinois, where there was a direct resistance by parties engaged in such a strike, to the receivers appointed by him, sentenced the ringleaders to six months in the county jail. In this case I do not feel as though it would be right to treat them exactly as though they occupied that same position, and yet, as I said before, I do not think it is a matter that can be overlooked. Things of this kind are not to be encouraged or tolerated, and the sentence will be that they shall be confined in the county jail for 60 days, and pay the costs of this attachment.

TREAT, J., (orally.) As far as I am concerned, I should have given a severer punishment if the matter had been left solely to me, and I should emphasize the statement very strongly that while no one would admit more readily than the judges of this court the right of every man to determine whether he will engage in this or another employment; and would protect him in that right through any proper judicial proceeding, he must not resort to lawless measures to injure the property or the person of any other party. More particularly is that true with regard to the receivers of courts. If there was any just ground of complaint, so far as the so-called strikers were concerned, this tribunal was open to have them present their matters here, and the court would have instructed the receivers with regard to it; and one of the prominent reasons why courts are so prompt to punish men who interfere with receivers in the custody and control of the property committed to them by law, is the fact that any one engaged in employment under them can have ample redress by applying to the court with respect thereto.

Now, instead of coming to this court to make application, as some other parties have done,—other employes,—they chose to engage in a lawless enterprise whereby were involved, not only the stoppage of commerce, but perhaps a loss of millions of dollars, and merchants and private individuals and all classes were injured by this lawless proceeding. And now the party comes and says, what? Evasively, "I did not know that I was interfering with the officers of this court;" but he did know that he was interfering with property that he had no right to interfere with, and "perchance he overstepped the limit, and involved himself within the jurisdiction of this court." Further, "We did not directly by physical force do sundry and divers things; we merely requested other persons to do it." A specious pretense! The court must be supposed to know, as everybody else does, what the object was; it was the threatening intimidation which lay behind the whole matter, and hence they are within the rule. "A request," under such circumstances, was a threat. The court cannot be blinded by such mere specious language. The fact is there—the positive fact that here was a direct threat and an intimidation. The form of language amounts to nothing. Courts do not stick in the letter; they

look at the fact,—the act itself,—and that was the case here. Parties determined lawlessly to stop the commerce of the country, so far as these roads were concerned, and to do it by force, by threats, and by intimidation; and in doing it they interfered with the property of this company under the charge of the court, and, instead of coming to this court, if they had any wrong to be redressed, and asking the court to adjust their cause, they took the law in their own hands, and they must suffer the consequences of doing it.

Of course I assent, as I must do, to the lenient punishment prescribed by the circuit judge; but if it had been left to me alone, it would have been much severer.

---

The first point that is to be discussed in connection with the foregoing opinion is that which is embodied in the following statement: "Suppose a party of men—and I state this merely as an illustration—combine to commit an assault and battery upon one person, and, without intending so to injure, do, through mistake, actually seize and beat a third person. Although such beating was unintentional, perhaps accidental, yet, as they were engaged in an unlawful enterprise, it is just the same as though they intended that unlawful attack upon the person actually receiving the injury."

The question which is here put, viewing it in its general relations, is one by which the courts have been frequently embarrassed. It is as old as the earliest opinions of Roman jurists. It comes to us as fresh in the cases of to-day as if it never had before been discussed. Is a man responsible for acts which are incidental to other acts designed by him, but which were, nevertheless, not intended by him? The general rule, I apprehend, may be thus properly stated: When the act in question results as a natural and probable consequence of an intended wrongful act, then the unintended wrong derives its character from the wrong that was intended. So far as concerns questions of general malice this position cannot be disputed. A man, for instance, from general malice, tears a rail off of a railway, or drops from a roof a very heavy substance on the pavement where a crowd is passing; and in such cases, if death ensues, he is responsible for murder, though he did not intend to take any one life in particular. This is also the rule in cases of special malice, when the object effected is incidental to the object intended. The same distinction has been accepted with regard to arson, where it is held that where the house of A. is burned instead of that of B., as the felon intended, this is arson as much as if the intent had been to burn the house of A.[1] In burglary, also, it is held to be no offense that the goods stolen were not those which the burglar intended to steal.[2] Nor is it a defense to an indictment for stealing that the defendant's intent was not to steal from any particular owner, or that it was to steal from a person who turned out not to be the real owner.[3]

These conclusions may be sustained on principle. Whatever I ought to regard as incidental to an intended act, I must be regarded as having intended. It is no defense, if I shoot at A. on the road and hit B., who happens to be behind A., that I did not actually see B. in the spot where he was shot. It was my duty to have seen him, and I am responsible for the consequences. It is true, as I have endeavored elsewhere to show,[4] that the proper way of apportioning the responsibility in such cases is by indicting the offender for shoot-

[1] R. v. Pedley, 2 East, P. C. 1026.
[2] R. v. Regan, 4 Cox, C. C. 335.
[3] R. v. Moore, Leigh & C. 1; 8 Cox, C. C. 416.
[4] Whart. Crim. Law, § 120.

ing at A. with intent to kill, and also for the negligent homicide of B. But, however this may be, that the offender in such a case is indictable for the injury that he ought to have seen, cannot be questioned.[1]

The observations that have just been made are peculiarly applicable to cases of riots arising from the illegal assertion of supposed rights, or redress of supposed grievances. Parties engaging in such a riot are indictable for the natural and probable consequences of the riotous confederacy. If the plan involve a crime, then the offenders are responsible for such crime when committed in execution of the plan.[2]

The only qualification is that such an act must result from the confederacy. If it does not, the confederates not engaged in it cannot be indicted for its commission.[3]

The rule is thus well stated by Judge CAMPBELL in *People* v. *Knapp*:[4] "There can be no criminal responsibility for anything not fairly within the common enterprise, and which might be expected to happen if occasion should arise for any one to do it. In other words, the principle is quite analogous to that of agency, where the liability is measured by the express or implied authority. And the authorities are quite clear, and reasonable, which deny any liability for acts done in escaping, which are not within any joint purpose or combination."[5] Hence it has been held that when several persons are engaged in committing a felony, and, on being detected, run different ways, upon which one of them, in order to get rid of a pursuer, assaults him, the others are not to be considered as indictable for the offense.[6]

The general rule is that the confederate is not responsible for the crime which is not a probable and natural consequence of the confederacy, unless such crime was committed with his assent. The question whether a party assaulting an officer in ignorance of the latter's official character is indictable for the aggravated offense, is one of greater difficulty. Undoubtedly we have statements made in such cases that if a man intends a wrongful assault, he is indictable for the distinctive offense of assaulting an officer, even though the assault was made in ignorance of the assaulted person's official rank.[7] But there is something very unreasonable in this. A public officer, whether he be a sheriff, or a constable, or a receiver, appointed by a court having jurisdiction, ought to give notice of his position, if he desire to clothe himself with the immunities of that position, at least so far as concerns a prosecution for an assault on himself personally. It is the official person of the assaulted party that creates the offense in such a case. It is true that if a statute should prescribe "whoever assaults an officer, even without knowing the person assaulted to be an officer, shall be guilty of the aggravated offense," etc., it

---

[1] See, on this subject, R. v. Smith, Dears. C. C. 559; 33 Eng. Law & Eq. 567; R. v. Jarvis, 2 Mood. & R. 40; R. v. Regan, 4 Cox, C. C. 335; Callahan v. State, 21 Ohio St. 306; Walker v. State, 8 Ind. 290; People v. Torres, 38 Cal. 141. In Com. v. McLaughlin, 12 Cush. 615, it was held that when A. shot at B. and C., intending to kill whichever he hit, he might be indicted for an assault with intent to murder both B. and C.

[2] Steph. Crim. Law, 27; Sissinghurst's Case, 1 Hale, P. C. 462; R. v. Manners, 7 Car. & P. 801; Com. v. Knapp, 9 Pick. 496; Norton v. People, 8 Cow. 137; McCarney v. People, 83 N. Y. 408; Breese v. State, 12 Ohio St. 146; Green v. State, 13 Mo. 382; Selvidge v. State, 30 Tex. 60; Miller v. State, 15 Tex. App. 125; People v. Brown, 59 Cal. 345. See State v. Buchanan, 35 La. Ann. 89.

[3] See R. v. Collison, 4 Car. & P. 565; R. v. Howell, 9 Car. & P. 437.

[4] 26 Mich. 112.

[5] See, to the same effect, R. v. Murphy, 6 Car. & P. 103; R. v. Franz, 2 Fost. & F. 580; R. v. Horsey, 3 Fost. & F. 287: R. v. Skeet, 4 Fost. & F. 931; R. v. Hawkins, 3 Car. & P. 392; R. v. Tyler, 8 Car. & P. 616; R. v. Price, 8 Cox, C. C. 96; U. S. v. Jones, 3 Wash. C. C. 209; Com. v. Campbell, 7 Allen, 541; Watts v. State, 5 W. Va. 532; Manier v. State, 6 Baxt. 595; Lamb v. People, 96 Ill. 73; People v. Knapp, 26 Mich. 112, State v. Stalcup, 1 Ired. Law, 30; Miller v. State, 15 Tex. App. 125.

[6] R. v. White, Russ. & R. C. C. 99; R. v. Skeet, 4 Fost. & F. 931; State v. Absence, 4 Port. 397.

[7] U. S. v. Liddle, 2 Wash. C. C. 205; U. S. v. Ortega, 4 Wash. C. C. 531; U. S. v. Benner, Bald. 234.

would be no defense that the defendant was ignorant of the officer's official position. But at common law the *scienter* is necessary to constitute the offense, subject to the qualification that a party is supposed to know what he ought to have known. On the other hand, it is no defense to an indictment for obstructing an officer in his duties (*the defendant knowing the officer's official position*) that the object of the defendant was to personally chastise the officer, and not to obstruct him in the discharge of his duties. The obstruction was incidental to the intended assault, and therefore the defendant was indictable for the obstruction.[1]

When we come, however, to discuss the question of an attachment for a contempt, a new state of facts is presented. A court of equity is obliged to enforce its decrees; and if those decrees are disobeyed, the only process to compel obedience is by attachment. This is eminently the case with disobedience to an order of specific conveyance,[2] with disobedience to orders of courts for payment,[3] and with disobedience to an injunction.[4] In such cases it makes no matter what was the intention of the party resisting the order of the court. Whether this resistance were intentional, or whether it were in knowledge of the existence of the decree resisted, or in ignorance thereof, makes no matter. An obstacle stands in the way of the execution of the court's decree, and that obstacle must be removed. Nor is it any defense in such case that the resistance is to a receiver whom the court appoints. The receiver is as much an officer of the court as is an officer appointed by the court to summon witnesses or to execute final process. Resistance in the first case is as much an obstruction of the process as is resistance in the last two cases. It may be objected that this bears with unnecessary harshness on persons ignorantly impeding the action of the receivers in a case such as the present. The same objection, however, applies to all other cases of resistance of process; and if the objection were held good, no process whatever could be enforced against parties who are so stupid or so angry as not to understand what is the nature of the authority which they resist. The relief in all such cases is an appeal to the clemency of the court, which will permit no penalty greater than the merits of the case demand. But, whatever be the penalty, the process of the court must be obeyed.                                   FRANCIS WHARTON.

*Washington, May 6, 1885.*

[1] U. S. v. Keen, 5 Mason, 453.
[2] Daniell, Ch. Pr. 1533; 2 Wait, Pr. 108-112.
[3] Id.
[4] Woodworth v. Rogers, 3 Wood. & M. 135; Rogers v. Rogers, 38 Conn. 121.