UNITED STATES v. WEBER et al.

(Circuit Court, W. D. Virginia. March 25, 1902.)

1. INJUNCTION ISSUED BY DISTRICT JUDGE—LIFE OF.
   Rev. St. § 719, providing that an injunction issued by a district judge as one of the judges of the circuit court shall not continue longer than to the circuit court next ensuing, unless so ordered by the circuit court, was intended to limit the life of injunctions issued by district judges acting as judges of the circuit court, only when issued in vacation.

2. LABOR UNIONS—ILLEGAL PURPOSES AND MEANS—LIABILITY OF MEMBERS AS CONSPIRATORS.
   If the object of a labor union is unlawful, or if the methods employed by it either to induce acquisitions to its ranks or to accomplish its ulterior purposes are unlawful, all persons who combine in such efforts are conspirators.

3. SAME—LEGALITY OF OBJECT—STRIKES—INTIMIDATION OF EMPLOYES.
   Though the right of persons employed by receivers of a mining corporation to voluntarily join a union having only legal purposes cannot be denied, nor the right of others to induce such action on their part by legal methods and fair moral suasion, they have no right to combine for the purpose of securing control of all mining operations, including those under the management of the receivers, with the intent of forcing compliance with their demands by means of strikes, nor have they the right, by threats and intimidation, to compel others, who do not desire to join the union, to quit work.

4. SAME—ORDERING EMPLOYES OF RECEIVERS TO QUIT WORK—EFFECT.
   Action on the part of a union composed of mining employés in ordering persons employed by receivers of a particular mining corporation to quit work is in itself a direct violation of the order of court directing the receivers to operate the plant.

5. SAME—VIOLATION OF INJUNCTION.
   An order made October 26th, specifically requiring of two named parties that they "desist from any interference with the employés of the said receivers, so as to affect the conduct of the business by the receivers," was shown to have been violated where it appeared that they addressed a number of the employés on March 2d following, and were about to address another crowd on the 12th when arrested, and that one of them then called out to the men to "continue their work" (of intimidation), and afterwards in a printed interview stated that they had advised the men to quit, and also that he had told a party that he had violated and intended to violate the order.

Contempt Proceedings.

Bullitt, Kelly & Hull and Blackford, Horsley & Blackford, for the United States.

H. M. Ford and Harrison & Long, for defendants.

Before SIMONTON, Circuit Judge, and McDOWELL, District Judge.

McDOWELL, District Judge. The defendants Weber and Haddow have been attached and brought before the court on a charge of violations of orders of this court made in the case of the Morton Trust Company against the Virginia Iron, Coal & Coke Company. The defendants Tom Braley, Cass Braley, and David Clarkson have been summoned by rule to show cause why they should not be held guilty of contempt for violations of these same orders. All the defendants have, in effect, denied the charges made against them. Both the attachment and the rule were issued upon information contained in a verified petition filed by the receivers appointed in the above-named cause.

It is well in the outset to state that the court fully recognizes the limitations on its powers as to contempts committed neither in the presence of the court nor so near thereto as to obstruct the administration of justice. Rev. St. § 725. That there must have been disobedience of, or resistance to, some order of the court is essential to constitute contempt in the case at bar.

By the first order entered in the case of the Morton Trust Company against the Virginia Iron, Coal & Coke Company the receivers thereby appointed were directed to take possession of and to operate the properties of the defendant company. By an order entered by the late Judge Paul, district judge, on February 12, 1901, certain named persons (not including any of these defendants), and "all other parties concerned whose names be hereafter ascertained," were enjoined from entering upon the property of the Virginia Iron, Coal & Coke Company, from trespassing thereon, and from intimidating or coercing, or attempting to intimidate or coerce, or in any manner interfering with the employés of said receivers with intent to induce them to quit the service of said receivers, and from entering into any conspiracy or combination for the purpose of hindering or obstructing the said receivers in the operation of their business at the "Looney Creek Lease." The Looney Creek Lease is the same operation that is now alleged to have been obstructed and crippled by the acts of these defendants.

As to the last-mentioned order, the point is made by counsel for the defendants that, as the order was made by a district judge, it ceased to be operative long before the acts here complained of are alleged to have been committed, because of section 719, Rev. St. The statute referred to was intended to limit the life of injunctions issued by district judges, acting as judges of the circuit courts, only when issued in vacation. 1 Bates, Fed. Eq. Proc. § 528; Vulcanite Co. v. Folsom (C. C.) 3 Fed. 509. But upon inquiry of the clerk at Abingdon, where this cause is docketed, it appears that the October term, 1900, of the circuit court was adjourned sine die on October 13, 1900. The next regular term there commenced by law in May, 1901. It follows, therefore, that said order ceased to be effective before the commission of the acts here complained of, and consequently the said order is not of moment in this discussion, except in so far as it served as a warning that the plant at Inman was under the charge of the court, and that

interference with the employés with intent to induce them to quit the service, or intimidating them to that end, had been regarded by the court as a violation of its orders.

With the petition for the attachment is filed, as Exhibit A, a printed poster giving, in effect, the terms of the above order. It appears that many copies of this poster had been conspicuously displayed, and that the defendants Weber and Haddow knew its contents. In fact Haddow testified that he knew the terms of the poster so thoroughly that he could repeat it almost verbatim. On October 26, 1901, one of the circuit judges of this circuit issued an order by which the defendants Weber and Haddow, by name, were ordered to show cause why they should not be attached for contempt in attempting to interfere with the conduct of the business of the receivers in the management of the properties intrusted to their hands by former orders of this court. And, further ordering, "that the employés of said receivers be enjoined from conspiring and agreeing with any person or persons whomsoever in attempting to interfere with the conduct of the business of the receivers. In the meantime, and until the further order of this court, that the said Haddow and Weber desist from any interference with the employés of said receivers, so as to affect the conduct of the business of the receivers." A writ of injunction, issued in pursuance of said order, was served on the defendant Weber, and knowledge of the contents of the writ appears to have been brought home to the defendant Haddow. But it does not appear that further action was then taken by the court. This was in November, 1901. It appears that all the defendants knew that the plant at Inman—the "Looney Creek Lease" —was being operated by the receivers of this court; that Weber and Haddow knew the purport of the injunction orders above mentioned; and it is entirely improbable that the other defendants were ignorant of the purport of the injunction order issued by Judge Paul.

Having thus set out the orders of this court, some or all of which are alleged to have been disobeyed or resisted by the defendants, it may further tend to clearness of thought to briefly consider some questions of law involved in this matter. It is admitted by defendants Weber and Haddow that they are officers of the organization known as the "United Mine Workers of America"; that their duties consist in part in organizing mine workers into local lodges of said order; that they came to Virginia both in October, 1901, and March, 1902, for the purpose of organizing such lodges among the miners working for the receivers at Inman and at Tom's Creek, as well as among miners working at other nearby plants. It appears from the evidence that in Western Pennsylvania, Ohio, Indiana, and Illinois the coal miners are so nearly all members of the organization that said regions may be considered as "union" territory. Further, that in West Virginia and Virginia a great many—perhaps a majority—of the miners are not members of the union. It also appears that when, on a former occasion or occasions, a general strike was ordered, the hopes of the organization were in some measure, at least, defeated because of the fact that the miners in West Virginia continued at work, and the coal thus produced went into the markets that would otherwise have been largely dependent upon the output of the union territory. Hence, it

seems, that the object in organizing lodges in the Virginias is to bring the Virginia mines under the control of the organization.

The right of the employés of the receivers to voluntarily join a union that has only legal purposes in view cannot be denied. Moreover, the right to induce, by legal methods and fair moral suasion, the employés of the receivers to join such an organization is not denied. But if the object of the union is illegal, or if the methods employed by it, either to induce acquisitions to its ranks or to accomplish its ulterior purposes, are illegal, it appears to be well settled that the persons who combine in such efforts are conspirators. In Bish. Cr. Law (7th Ed.) § 171, it is said:

"Conspiracy is the corrupt agreeing together of two or more persons to do, by concerted action, something unlawful, either as a means or an end."

In 24 Am. & Eng. Enc. Law (1st Ed.) p. 131, under the head of "Strikes," is a quotation from Com. v. Shelton, 11 Va. Law J. 324, in which the court of appeals of Virginia said:

"The authorities seem to agree that the gist of the offense is the conspiracy, and that a conspiracy is a confederacy to do an unlawful act, or a lawful act by unlawful means, whether to the prejudice of an individual or the public. But by 'unlawful' it is not intended to mean that the acts agreed to be done must be criminal; it is enough if they be wrongful and with improper or evil intent. Thus, it has been held that threats, intimidation, or any forcible means, other than lawful competition, are unlawful. To threaten another in order to deter him from doing some lawful act * * * has always been considered a misdemeanor at common law."

See, also, Crump's Case, 84 Va. 927, 6 S. E. 620, 10 Am. St. Rep. 895, which contains much valuable learning on the subject of conspiracy, and is indirectly authority for the proposition that a combination for the purpose of effecting a legitimate object by illegitimate means is a criminal conspiracy.

It is an equally well-settled doctrine that each of the confederates is liable for all such illegal acts of the others as may be reasonably anticipated as incidental to the intended act. An excellent discussion of this question is appended to the report of In re Doolittle (C. C.) 23 Fed. 549. See, also, U. S. v. Kane, Id. 748; Mitchell's Case, 33 Grat. 845; 1 Bish. Cr. Law (7th Ed.) § 636.

In the first place, it is hardly open to serious question that the ultimate purpose of the union is not legal. This purpose is to secure control of mining operations, including those under the management of the receivers of this court. Confessedly, control is desired for this purpose: If the union miners in some other state make complaint of grievance,—the justness of the complaint to be judged solely by the union,—the union will be in a position to enforce compliance with their demands by ordering and carrying into effect a general strike.

Can this court rightfully surrender control of the works under its charge to the United Mine Workers? On authority it is clear that it cannot. See In re Higgins (C. C.) 27 Fed. 445; In re Wabash R. Co. (C. C.) 24 Fed. 217; In re Doolittle (C. C.) 23 Fed. 544; Thomas v. Railroad Co. (C. C.) 62 Fed. 803. On reason, also, it is equally clear. But a discussion of the reason for this rule, involving sociological questions of much interest, cannot now be entered into.

To go further, it appears from the evidence that, in order to perfect the control desired by the union, it is necessary that practically all mine workers be members of the organization and subject to its directions. In other words, it is necessary that nonunion men—men who do not desire to join the union—be compelled to quit work. This is one of the avowed means to the desired end. That this is illegal and not to be tolerated needs no argument. Hence, even if it were conceded that the ultimate purpose is legal, yet, as a means intended to be used to effect the ultimate purpose is illegal, it follows that a combination to effect the purposes of the union is a conspiracy.

It is proven here beyond all reasonable doubt that until very recently there were between 600 and 700 employés at work at the Inman plant, and that at the time the witnesses left there to attend court the number of men at work had fallen off to about one-third of that number; thus restricting the output of the plant, and materially reducing the income derived from its operation.

It was further proven that on the night of Sunday, March 9, 1902, sundry notices, each bearing the impress of the seal of the local lodge or union of the United Mine Workers, were conspicuously posted about the works. Two of the notices produced here read:

"Local No. 1,763: I hereby notify you coke pullers and loaders to stop work.                                                                            U. M. W. of A."

The other read:

"Notice.

"Inman.                                                                                       No. 1,763.
              "U. M. W. of A.    March 9, 1902.
"To All Miners and Mine Workers: You are notified that your works are suspended, and we ask that all of you come out and assist us in this struggle for freedom. To one and all.
              "Yours for success,                                    U. M. W. of A."

It is also a fact that many, if not all, of the Hungarians employed at the plant had been intimidated and prevented from work because of threats that if they worked they would be shot. That others of the employés had been intimidated was also proved. Some of the witnesses introduced by the government gave visible evidence while on the witness stand that they stood in great fear of the union. In fact, no one hearing the testimony and observing the demeanor of many of the witnesses could well doubt that at least some of the employés had been intimidated and induced to quit work because of fear, and that others had been forced to join the union by the same method. That the seal impressed upon the notices above mentioned is the seal of the local lodge at Inman was admitted. Two of the defendants—Cass Braley and David Clark or Clarkson—are proved to have been members of the union, and to have posted some of said notices.

It is earnestly contended that the defendants Weber and Haddow never participated in, sanctioned, or advised any of the illegal acts traced to some members of the union. But the act of the union in ordering the coke pullers and loaders to stop work is in itself in direct contravention of the order of this court directing the receivers to operate the plant. In other words, such acts are illegal. Coupled with the known intimidation of some of the employés, the above no-

tices can hardly be considered otherwise than an order, not to be disobeyed with impunity, to stop work. Again, the notices containing the statement that the "works are suspended" is itself in contravention of the orders of this court.

There is no necessity to consider these notices in so far as they may be treated as a mere request or invitation to the nonunion men to quit work. The announcement that the works are suspended carries with it by implication something sinister, and something altogether different from a mere invitation to quit work.

It therefore seems, to say the least, probable that the union, in order to carry out its ultimate purpose, resorted in the case at bar to threats and intimidation of the nonunion laborers. But, even if not, certainly the union, by some member or members having control of its seal, did resort to direct violations of the orders of this court in order to carry out its purposes. The union has never disavowed the responsibility for the issuance of the notices above mentioned. In their bearing on the statement that the union intended to use unlawful means to secure its end, the addresses made by the defendants Weber and Haddow at the meeting on Sunday, March 2, 1902, are of importance. At that meeting much that was said by these organizers was proper and unobjectionable. But, even from the testimony of these defendants themselves, it appears that intimations were thrown out that if the nonunion men did not join, and if the plant did not become subject to the union, the product of the mines might be boycotted, as such a thing had been done and might be done again. According to the witness George Kilgore, who seemed to be disinterested, what was said was that in the event mentioned the product of the mines would be boycotted, and all nonunion miners would be blacklisted and denied work at any unionized mines.

There is another fact developed in the evidence that has its bearing just here. It appears that there is another mining operation, "Stonega," located near the Inman plant, which is operated by the Virginia Coal & Iron Company. Extraordinary efforts seem to have been made by this company to keep organizers of the Mine Workers from coming on the property, notwithstanding which they went on the property. However, mere visits by one or a few organizers did not produce the desired result. Hence a plan was formed by Weber, and apparently also by Haddow, to march a body of 150 union men to the Stonega plant. This plan failed because of some accident. The court cannot close its eyes to the probable effect of such a demonstration. It would almost surely have resulted in intimidating men at Stonega who did not wish to join the union. Can the organizers of this intended demonstration be considered as innocent of knowledge that their confederates at Inman would adopt similar methods of intimidation? Under the rule of law as to conspiracy, each of these defendants is guilty of the above-mentioned illegal acts of the others done in pursuance of the common design.

So far the question has been discussed without particular reference to the order of October 26, 1901. This order specifically requires of Haddow and Weber that they "desist from any interference with the employés of the said receivers so as to effect the conduct of the busi-

ness of the receivers." Under attachment from this court, these defendants were arrested on the evening of March 12th inst. They had addressed a number of the employés on Sunday the 2d, and were when arrested on the cars at Appalachia, a depot near Inman, whence they had come for the purpose of again addressing the men. Between the 2d and 12th the works at Inman had been greatly crippled by the acts of the union. Upon being arrested, the defendant Weber, according to disinterested witnesses that cannot be disbelieved, put his head out of the car window, and, speaking to a crowd of union men there collected, advised them to "continue their work," and not to agree to anything until he and Haddow returned. The "work" the union was then engaged in, certainly in part at least, consisted of intimidating nonunion men who wished to work. Again, after having been brought to Lynchburg, a reporter of an afternoon Lynchburg paper interviewed the defendants. According to the printed interview, Weber said to the reporter, in substance, that he and Haddow had advised the men to quit work unless the men that had been discharged were reinstated. No satisfactory denial of the correctness of this interview was made. The witness Baldwin testified that Weber told him that he had violated the order of October 26, 1901, and intended to violate it. This witness had no interest to misstate the facts in this respect. The conclusion is forced upon the court that both Weber and Haddow knowingly and intentionally disobeyed the said order.

An order will be entered punishing the defendants for their contempt: Tom Braley, one month's imprisonment; Cass Braley, two months' imprisonment; David Clarkson, two months' imprisonment; John Haddow, six months' imprisonment; Wm. Weber, six months' imprisonment.

SIMONTON, Circuit Judge. Having carefully read the evidence in this case, I hereby fully concur in the reasoning of the district judge and in his conclusion.

### Order.

This cause came on to be heard upon the petition of Henry K. McHarg and A. A. Phlegar, receivers of the Virginia Iron, Coal & Coke Company, on attachments against Wm. Weber and John Haddow; and on the rules to show cause issued against Thomas Braley, Cass Braley and David Clarkson, and the returns of the said respondents, hearing the same, and the testimony produced before the court, and considering the arguments of counsel thereon, it is adjudged, ordered, and decreed that the said attachments and the said rules issued against the said respondents Wm. Weber, John Haddow, Thomas Braley, Cass Braley, and David Clarkson be made absolute, and that the said respondents are in contempt of the orders of this court. It is further ordered that the said Wm. Weber and John Haddow be each imprisoned in the jail of the city of Lynchburg for the term of six months each; and Thomas Braley be imprisoned in the jail of Wise county, in the state of Virginia, for the term of one month; and that Cass Braley and David Clarkson be each imprisoned in the county jail of Wise county aforesaid for the term of two months each. It is further ordered that capias be issued for each of the respondents

Thomas Braley, Cass Braley, and David Clarkson; and that the terms of imprisonment herein provided for each of the said parties shall begin as to each of them, respectively, when he is lodged in the jail as provided in this order; that this order be signed in duplicate, one to be entered in the office of the clerk of this court at Abingdon, and the other to be placed in the hands of the marshal of this court for action thereon.