**BEVERLY ENTERPRISES, INC.,**
Plaintiff-Appellee,

v.

**FREDONIA HAVEN, INC.,**
Defendant-Appellant.

No. 86–7472.

United States Court of Appeals,
Eleventh Circuit.

Aug. 25, 1987.

---

James W. Gewin, Bradley, Arant, Rose & White, Birmingham, Ala., John J. Park, Jr., Howard W. Neiswender, Tanner & Guin, P.C., Tuscaloosa, Ala., for defendant-appellant.

Andrew P. Campbell, Leitman, Siegal & Payne, P.C., Birmingham, Ala., for plaintiff-appellee.

Before TJOFLAT and ANDERSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

HENDERSON, Senior Circuit Judge:

Fredonia Haven, Inc. (Fredonia) appeals from a decision of the United States District Court for the Northern District of Alabama binding Fredonia to the terms of a parol lease agreement with Beverly Enterprises, Inc. (Beverly). Finding that the district court gave proper effect to the oral lease agreement based on the part performance exception to the Alabama statute of frauds, we affirm.

The resolution of this appeal depends upon a proper understanding of the rather complicated history of the formation of the lessor/lessee relationship between the two parties. For this reason, we set out these facts in some detail.

The appellant, Fredonia, is a closely held Alabama corporation owned in equal parts by three shareholders, Dale Hendrix, president of the corporation, Thomas Edd Snoddy, attorney for Fredonia and Jane Laird, his sister. The corporation was formed in 1973 for the purpose of building and operating a nursing home in Double Springs, Alabama. As construction of the health care facility neared completion, however, Fredonia ran short of capital and was forced to lease the establishment to James Estes who provided the funds necessary to complete the nursing home. Fredonia and Estes executed a "Commercial Lease" dated September 24, 1974 reciting the rights and obligations of both parties. The document provided for an original five-year lease term with two successive five-year renewal options open to the lessee upon sixty days notice to the lessor, Fredonia. This resulted in Estes having the right to a leasehold estate for fifteen years from September 24, 1974 to September 23, 1989. As consideration for the lease, Estes agreed to pay Fredonia the sum of $90.00 per month multiplied by the total number of beds in the nursing home. The lease also obligated Fredonia to pay all taxes, insurance premiums and the cost of major maintenance and repairs.

In 1978, James Estes formed his own corporation, Estes Health Care Centers ("EHCC"), and the 1974 lease was assigned to EHCC with the consent of Fredonia. From 1974 to 1981, Estes and EHCC operated the nursing home without default. While that lease contained a provision for periodic rent increases as an allowable medicare-medicaid cost with state approval, there was no escalation as of 1981 over the $90.00 per bed rental since Estes was never

able to obtain state approval for any increases.

In or about October 1981, Beverly, a nationwide operator of nursing homes, entered into an agreement for the purchase of the stock and subsequent merger of EHCC with Beverly. This agreement included Beverly's assumption of EHCC's rights under all outstanding leases, including the Fredonia lease. Concerned that the merger might, under Alabama law, constitute an assignment of the leases without lessor approval, Beverly insisted that James Estes obtain a written agreement to the assumption of the leases from the owner-lessors of the health care facilities occupied by EHCC.

Estes presented the proposed agreement to the owner-lessors in letter form explaining the upcoming stock purchase merger and Beverly's desire to assume the EHCC leases. The letter requested the lessors' written execution and acceptance of the letter agreement at the bottom of the document under language stating "Agreed to on this the _____ day of _____, 1981." It is undisputed that Dale Hendrix, as president of Fredonia, executed this letter agreement consenting to the merger on November 17, 1981.

Fredonia also prepared another document dated November 17, 1981 which purported to set out conditions for the corporation's consent to the merger. The handwritten memorandum recited that in the event of the assignment to Beverly, as agreed by all the parties, Beverly would pay Fredonia an additional rental fee of $5.00 per bed per month beginning January 1, 1982, with an additional $2.00 per bed escalation every second year thereafter. Furthermore, Beverly was to assume all costs of repairs and maintenance, all insurance costs, and all taxes due during the term of the 1974 lease and the terms of any amendments entered into between Fredonia and Beverly "including a two-year extension."

Apparently as a result of these demands,[1] Charles Wright, Senior Vice President of Beverly, agreed to meet with the Fredonia shareholders. In late November, the parties met in the Birmingham, Alabama offices of James Estes, who continued to take an active role in placating Fredonia. There is a substantial conflict in the evidence concerning the precise agreement reached at this conference. All the participants concede that Beverly shouldered the responsibility for taxes, insurance and maintenance on the Double Springs nursing home, and committed to the increased rental payments contained in the handwritten memorandum. Fredonia and Beverly part company, however, with respect to the term of the new lease agreement. At trial, Charles Wright and James Estes contended that during the Birmingham meeting Fredonia agreed to a new five-year lease term beginning January 1, 1982 with two optional renewal terms of five years each. Hendrix and Snoddy maintained that they agreed to a two-year extension giving Beverly approximately a ten-year leasehold under the 1974 lease agreement.

After the Birmingham conclave, Beverly's attorneys prepared a letter, dated December 4, 1981, purporting to contain the terms of the new lease agreement with Fredonia. The letter set out the new rental fees and shift of tax, insurance and maintenance costs to Beverly, but was silent as to the duration of the lease under the new agreement. Beverly maintains that the five-year lease period with two optional five-year renewals agreed upon at the Birmingham meeting was omitted through oversight. The letter was signed as "agreed to and accepted" by Edward Snoddy on behalf of Fredonia. Following the merger with EHCC, Beverly took possession of the nursing home and increased the rent from $90.00 per bed per month to $95.00 per bed beginning in January 1982. Beverly began paying all taxes, insurance

1. Edward Snoddy of Fredonia agreed with James Estes and Charles Wright that the handwritten memorandum sought to engraft a unilateral set of conditions on Hendrix' prior consent which prompted the subsequent Birmingham meeting. Hendrix and Jane Laird testified, somewhat vaguely, that the memorandum was prepared *after* the Birmingham meeting and back-dated.

and maintenance costs on the nursing home. Beverly also made substantial and costly repairs and improvements to the health care facility, including the addition of a new roof, the repavement of the parking lot and the construction of a laundry building on the premises.

In March of 1982, William H. Kennedy, III, counsel for Beverly, sent a written lease agreement, drafted in accordance with the agreement made in Birmingham, to William Wright and Edward Snoddy. Kennedy had delayed the submission of the lease until Beverly received final regulatory approval for their operation of the Double Springs nursing home. The lease agreement essentially redrafted the 1974 lease with new provisions for the increased rental payments, assumption of other financial obligations by Beverly and a five-year lease term with two successive options to renew for five more years. On March 12, 1982, William Wright executed the lease on behalf of Beverly and mailed it to Snoddy.

On March 15, 1982, after receipt of the new lease, Snoddy called Kennedy's office to point out two small errors on the twelfth page of the lease documents. He made no objection to the duration of the new lease. Kennedy made the requested corrections and forwarded a revised page 12 to Snoddy for substitution in Fredonia's copy of the agreement. Kennedy called Snoddy during the first week of April to make sure that Fredonia had received the corrected page. Kennedy testified that Snoddy stated that he had no other problems with the lease and that he would execute the document and return it to Beverly. Although the parties continued to operate under the terms of the new lease, Fredonia never signed the agreement. In 1984, Fredonia informed Beverly of this fact but made no attempt to terminate the leasehold.

In early May 1986, Fredonia signed a Letter of Intent to sell the Double Springs facility to National Health Care, Inc. This sale was conditioned upon the termination of Beverly's leasehold interest in the property. Accordingly, on May 13, 1986, Fredonia gave Beverly notice that it was terminating the tenancy effective June 13, 1986. Fredonia maintained that the new lease agreement was void under the statute of frauds because it had never been signed by Fredonia as lessor. Since Beverly had failed to exercise the last option to renew under the 1974 lease, Fredonia contended that Beverly occupied the Double Springs facility as a tenant at will.

On May 23, 1986, Beverly filed this action seeking a declaratory judgment that it had a valid pending lease with the option to renew for two successive five-year terms. Beverly also sought preliminary and permanent injunctive relief prohibiting Fredonia from attempting to terminate the lease. The district court entered a preliminary injunction and held a bench trial on June 12 and 13, 1986.

After considering the extensive oral testimony and documentary evidence presented at the trial, the district court found that an oral lease agreement was effected between the parties as a result of the meeting in Birmingham, Alabama. Resolving credibility choices in favor of Beverly, the trial court determined that this agreement included a five-year lease term with two five-year options to renew.

In support of this factual finding the court noted that the handwritten memorandum prepared by Fredonia which mentioned a two-year extension constituted an admission by the defendant that the parties contemplated an extension of the term of the September 24, 1974 lease agreement. The court considered it unreasonable to believe that Beverly would undertake the substantial financial obligations contained in the new lease in return for a mere two-year extension. Furthermore, Fredonia presented no evidence as to how a two-year extension was to tack on to the 1974 lease term.

The court held that the oral lease agreement was valid and enforceable under the part performance exception to the Alabama statute of frauds, Ala.Code § 8-9-2(5) (1975). The court also held that Fredonia was barred from denying the validity of the oral agreement as reflected in the unexe-

cuted commercial lease under principles of equitable estoppel.

Fredonia appeals the determination of the district court that Beverly's part performance of the Birmingham agreement dispensed with the necessity of executing a written lease. The Alabama statute of frauds contained in Ala.Code § 8–9–2 reads, in pertinent part:

In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:

. . . .

(5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof, is paid and the purchaser is put in possession of the land by the seller.

. . . .

Interpreting this provision, the Supreme Court of Alabama has stated:

To take a case out of the statute of frauds ... upon the ground of part performance ... [t]he existence of the contract and its terms should be established by competent proof to be clear, definite, and unequivocal in all its terms. If its terms, or the necessary acts of part performance, are not sustained by satisfactory proof, specific performance will not be decreed.

*Hagood v. Spinks*, 219 Ala. 503, 504, 122 So. 815, 816 (1929). Fredonia challenges both the district court's finding of fact that the parties entered into a binding oral contract with definite terms and the court's legal conclusion that the contract met the part performance exception to the statute of frauds.

Fredonia first disputes the finding of the district court that the parties entered into a binding lease agreement during the Birmingham conference in November, 1981. This finding of fact is subject to narrow appellate review. Rule 52(a) of the Federal Rules of Civil Procedure mandates that

"[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Our precedent holds that a district court's factual finding is clearly erroneous and reversible under this rule only when the reviewing court, upon consideration of the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Lincoln v. Board of Regents of University System of Georgia*, 697 F.2d 928 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983).

■ Applying this standard to the present record, we are not persuaded that the district court committed clear error in finding that the Birmingham meeting resulted in a binding parol agreement as reflected in the subsequent written document forwarded to Snoddy. Fredonia contends that the oral agreement reached by the parties was never intended to be a binding contract. Beverly conceded, and the district court specifically found, that the parties intended that the parol lease agreement be confirmed in a formal commercial lease agreement to be drafted by Beverly's attorneys and executed by the parties. Nevertheless, the district court concluded that the parol lease arrangements constituted a "firm, definite agreement" and not merely an "agreement to agree" at a later date. The court's factual conclusion is fully supported by evidence admitted at the trial. The December 4, 1981 letter from Beverly to Fredonia, signed by Snoddy, clearly indicates that the parties agreed to amend the lease of the Double Springs facility in accordance with the terms agreed upon in Birmingham until such time as a new written lease could be executed. Beverly did, in fact, take possession of the nursing home and operate under the terms of the Birmingham agreement for several months before Beverly's attorneys drafted the new written lease. Therefore, the district court's factual finding that the parties entered into a binding oral lease agreement

in November of 1981 is fully supported by the record.[2]

■ Fredonia also urges that the December letter is not sufficiently specific to form a contract because it does not state the term of the lease agreement purportedly reached between the parties. This assertion overlooks the fact that the district court did not rely upon the letter as a written memorandum of a contract satisfying the statute of fraud. Rather, the letter, along with other documentary evidence and testimony, merely provided proof of an antecedent oral agreement. The district court's finding that this oral agreement included a stipulation that a new five-year lease beginning January 1, 1982 would be granted to Beverly with two optional five-year renewal terms is supported by other valid evidence.[3] According to Snoddy, Estes and Wright, Fredonia had given an unconditional approval of the merger with EHCC before the Birmingham conference. Therefore, the only consideration moving Beverly to undertake the increased rental payments and substantial tax, maintenance and insurance burden of the nursing home was an extended lease term. The district court concluded, as a matter of business practicality, that Beverly would not have acceded to a mere two-year extension in return for the heavy financial responsibilities shouldered under the new lease. The testimony of James Estes, now a disinterested party, supported Beverly's claim that the parties reached a firm agreement as to a new potential fifteen-year lease. There-

fore, the district court's finding is not clearly erroneous.

■ The threshold issue to be decided concerning the statute of frauds is whether its provisions apply to the oral agreement reached by the parties. The 1981 agreement resembled a modification of the existing 1974 lease agreement between the parties rather than a new contract. Under Alabama law, a lease agreement required by the statute of frauds to be in writing may, in some instances, be modified by oral agreement. *Southland of Alabama, Inc. v. Julius E. Marx, Inc.*, 341 So.2d 127 (Ala.1976); *Rudder v. Trice*, 236 Ala. 234, 182 So. 22 (1938); *Messer v. Dupuy-Burke Realty Co.*, 226 Ala. 438, 147 So. 193 (1933). Where the change in the underlying agreement affects a material element of the contract and not merely a substituted manner of performance, however, Alabama law requires that such alterations themselves satisfy the statute of frauds. *Cammorata v. Woodruff*, 445 So.2d 867, 872 (Ala.1983); *Rudder v. Trice*, 236 Ala. at 236–37, 182 So. at 22. Since the variations in the terms of the 1974 lease decided upon at the Birmingham meeting went to the substance of the contract, affecting the rental fees, the lease term and other substantial financial obligations, the agreement clearly falls within the ambit of the statute of frauds whether designated as a modification of the existing lease or as a new lease agreement.

■ Although the statute of frauds mandates that this agreement be memorialized

2. We also note that, under Alabama law, a stipulation that a parol agreement will not become binding until put in writing and executed by both parties may be waived by part performance of the oral contract. The Supreme Court of Alabama stated in *Byars v. James*, 208 Ala. 390, 392, 94 So. 536 (1922):

If it was stipulated at the time of the conclusion of negotiations between the parties that the contract should be reduced to writing by plaintiff, there was no completed contract until this was done and the same executed by the parties thereto [citations omitted]. This provision may be waived by the parties respectively, by delivery of possession and payment of a part of the purchase price.

Since we agree with the district court that the parol agreement in this case is saved from the

statute of frauds by Beverly's part performance, Fredonia's argument may be unavailing even if the Birmingham meeting resulted in nothing more than an "agreement to agree."

3. Fredonia contends that the district court's resolution of the conflicting evidence in this case sanctioned the type of "swearing match" sought to be avoided by the statute of frauds. The Alabama courts, however, frequently resolve issues concerning the existence of an oral agreement and the exclusiveness of possession on the basis of disputed testimony. *See e.g., Houston v. McClure*, 456 So.2d 788, 789 (Ala.1984); *Eugerton v. Courtaulds*, 421 So.2d 104 (Ala.1982); *Krieger v. Krieger*, 276 Ala. 466, 469, 163 So.2d 623 (1964).

in written form, the oral contract may be upheld if it meets the part performance exception. Under this provision, the proscriptions of the statute of frauds may be evaded with respect to oral leases for more than one year where rent is paid under the agreement and possession is surrendered to the tenant. *Shakespeare v. Alba,* 76 Ala. 351, 355 (1884).

Fredonia claims, however, that the part performance exception does not apply where the oral lease agreement has been reduced to written form but not signed by the party to be charged. The cases cited by Fredonia do not support this position. In *Heflin v. Milton,* 69 Ala. 354 (1889), the Supreme Court of Alabama considered a situation very similar to the present facts. A seller of land sought to enforce a purchase contract which he had drafted, signed and sent to the purchaser who entered into possession of the land. The court noted that the seller, who had signed the contract, could be charged with the duties and obligations contained therein but that the agreement was void as to the purchaser because without his signature, the writing did not meet the requirements of the statute of frauds. After determining that the transaction fell within the proscription of the statute, the court specifically addressed the applicability of the part performance exception. Although the exception did not control under the facts in *Heflin* because the purchaser had not paid any portion of the purchase price, the court's analysis is clear. A written memorial of a contract, unexecuted by the party to be charged, does not escape the bar of the statute of frauds *unless* it satisfies one of the specially enumerated exceptions.

Fredonia's reliance on *Byars v. James,* 208 Ala. 390, 94 So. 536 (1922) is similarly misplaced. In *Byars,* the Supreme Court of Alabama considered the evidentiary question of whether a writing, purportedly the written embodiment of a contract which the parties never executed, was admissible to establish the terms of the agreement. The court held that the unsigned document was not admissible as a written lease of real property for a term of more than one year. Under *Heflin v. Milton,* the con-

tract, although reduced to written form, fell within the bar of the statute of frauds due to the absence of the signature of the party to be charged. Since the only issue presented in *Byars* concerned the admissibility of the unexecuted written document as evidence of the oral contract, the court had no occasion to address other methods of proving the contract's validity such as part performance. Consequently, Fredonia's argument that the reduction of a parol lease agreement to a writing signed by only one of the parties negates the possibility of satisfying the part performance exception is not supported by Alabama law.

Fredonia next contends that even if the part performance exception does apply, Beverly has not fulfilled the requirements of that provision necessary to remove the parol lease agreement from the statute of frauds. While Fredonia does not dispute Beverly's compliance with the payment prong of section 8–9–2(5), it contends that Beverly's possession of the Double Springs property is not sufficiently specific to demonstrate the necessary part performance mandated by the Alabama statute.

The Alabama Supreme Court has held that to take a case out of the statute of frauds on the ground of part performance, the acts of possession must be clear and definite and referable exclusively to the contract. *Hagood v. Spinks,* 219 Ala. 503, 122 So. 815, 816 (1929). The court has further expounded on the meaning of "referable exclusively to the contract":

> That is to say, it must be such possession that an outsider, knowing all the circumstances attending it save only the one fact, the alleged oral contract, would naturally and reasonably infer that some contract existed relating to the land, of the same general nature as a contract alleged.

*Jones v. Jones,* 219 Ala. 62, 63, 121 So. 78 (1929). The possession must refer exclusively to the contract sought to be enforced. *Quinlivan v. Quinlivan,* 269 Ala. 642, 114 So.2d 838 (1959). "A possession taken as a lessee, and continued without visible change, does not tend to prove that such occupant was put in possession by the

owner, and is not an act tending to give notice of a change of holding." *Reynolds v. Bryant*, 281 Ala. 372, 375, 202 So.2d 734 (1967).

Fredonia maintains that Beverly's possession of the nursing home facility remained unchanged following the Birmingham meeting. The occupation of the Double Springs property is not referable exclusively to the alleged parol lease agreement because such possession was equally plausible under an assumption of the 1974 lease between Fredonia and EHCC. Such possession is not "referable exclusively to the contract" and hence does not satisfy the part performance exception.

It is true that Alabama courts have held that where one already in the possession of land as a tenant verbally contracts with the owner for a new term, his mere continuing in possession for the time embraced by the old lease is not an act of "taking possession" within the meaning of the rule. *Danforth v. Laney*, 28 Ala. 274 (1856). In such a case of tenancy, the possession is referred to the title under which it is then held. *McCarthy v. Nicrosi*, 72 Ala. 332 (1882). However, if the nature of the holding is different from the original tenancy, such as by payment of a higher rent, or by other unequivocal circumstances, referable solely and exclusively to the contract, then the possession may remove the case from the requirements of the statute. *Formby v. Williams*, 203 Ala. 14, 81 So. 682 (1919).

Based on the evidentiary record, we must agree with the district court that the nature of Beverly's leasehold was altered as of January 1, 1982 as to give notice of a new lease agreement between the parties with the terms agreed upon in Birmingham and subsequently set forth in the unexecuted written lease. An outsider knowing the facts of the landlord-tenant relationship between the parties including the increase in rent, shift of taxes, insurance and maintenance costs from Fredonia to Beverly and construction of substantial improvements to the facility by Beverly would naturally conclude that the parties had substantially altered the 1974 lease agreement along the lines of the Birmingham compact.

This conclusion is supported by a case recently decided by the Supreme Court of Alabama. In *Dixieland Food Stores, Inc. v. Geddert*, 505 So.2d 371 (Ala.1987), the court held that the tenant's possession of the leased premises following its negotiation of a renewal agreement with the landlord was not "exclusively reference" to the renewal agreement so as to constitute part performance. The lessee admittedly continued to pay the rent installments required by the original lease and not an amount calculated in accordance with the renewal agreement. The court concluded that these payments were not the purchase money called for by the oral renewal agreement. The lessee's possession was thus consistent with the old lease and not the renewal agreement. *Id.* at 374. The clear import of this decision is that increased rental payments consistent with the oral agreement would satisfy the part performance exception. It is undisputed that Beverly increased its rental payments to Fredonia in accordance with the terms of the new lease agreement. Therefore, the possession of the nursing home is evidenced by unequivocal circumstances that refer exclusively to the parol lease agreement. The requirements of the part performance exception to the statute of frauds are met and the parol lease agreement is valid and binding on both parties.

█ The district court also concluded as a matter of law that Fredonia is barred from denying the validity of the oral lease under the principles of equitable estoppel. Having concluded that the district court did not commit clear error in determining that the parties entered into a binding oral contract rescued from the strictures of the statute of frauds by the part performance exception, it is unnecessary for us to consider whether Fredonia is estopped from asserting this defense. We agree with the district court, however, that Snoddy's representations to Beverly concerning the acceptability of the written lease agreement estop Fredonia from denying that the document represents the binding oral agreement formed in Birmingham. For all the

foregoing reasons, the judgment of the district court is

AFFIRMED.