**Mel T. NELSON and Metro Auto, Inc., Petitioners/Cross–Respondents,**

**v.**

**John A. ELWAY, Jr.; Rodney L. Buscher; J.R. Motors Company, a General Partnership; and J.R. Motors Company South, a General Partnership, Respondents/Cross–Petitioners.**

**No. 94SC453.**

Supreme Court of Colorado, En Banc.

Dec. 11, 1995.

Rehearing Denied Jan. 16, 1996.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Podoll & Podoll, P.C., Richard B. Podoll, Robert A. Kitsmiller, Denver, for Petitioners/Cross–Respondents.

Brownstein Hyatt Farber & Strickland, P.C., Stanley L. Garnett, Patrick F. Carrigan, Denver, for Respondents/Cross–Petitioners.

Chief Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the decision by the court of appeals in *Nelson v. Elway*, No. 93CA0629 (Colo.App. May 26, 1994), affirming in part and reversing in part the trial court's grant of summary judgment in favor of the respondents. The court of appeals affirmed the trial court's entry of summary judgment in the respondents' favor as to the petitioners' allegations of breach of

contract, fraud and misrepresentation, dual agency, civil conspiracy, and punitive damages. The court of appeals reversed the trial court's entry of summary judgment as to the promissory estoppel count in the petitioners' complaint, ruling that there existed a material issue of fact as to this count. We reverse the court of appeals decision reversing summary judgment as to the promissory estoppel claim and affirm in all other respects.

## I.

Mel T. Nelson (Nelson) was the president and sole shareholder of two car dealerships, Metro Auto and Metro Toyota, Inc. General Motors Acceptance Corporation (GMAC) provided all the financing for both dealerships. In the first half of 1990, both dealerships were experiencing financial difficulties. In July of 1990, Nelson retained John J. Pico and the Aspen Brokerage Company (Pico) to represent him in the selling or refinancing of one or both of the dealerships.

In early 1991, Pico, acting on behalf of Nelson and Metro Toyota, began negotiations with John A. Elway, Jr. (Elway) and Rodney L. Buscher (Buscher) regarding the sale of Metro Toyota and the property upon which it was situated. On March 14, 1991, pursuant to those negotiations, Elway and Buscher signed a "Buy–Sell Agreement" and a separate real estate contract to purchase Metro Toyota. The closing was scheduled for April 15, 1991.

Soon after the signing of these documents, Pico asked Nelson if he would be willing to sell both Metro Auto and Metro Toyota to Elway. Nelson stated that he would be willing to sell both dealerships along with the land upon which they were located if he received sufficient personal remuneration. Pico then began negotiating with Elway and Buscher regarding the sale of both dealerships. Through these negotiations it became apparent that Elway and Buscher were unwilling or unable to pay the full purchase price for the dealerships and the land upon which they were located.

In order to consummate the transaction, Pico suggested to Nelson that Elway and Buscher reimburse Nelson for his interest in Metro Toyota by paying Nelson $50 per vehicle sold by both dealerships for a period of seven years commencing on May 1, 1991. In exchange for this compensation arrangement, Elway and Buscher would purchase Metro Auto from Nelson at a greatly reduced purchase price. These terms, referred to by the parties as the "Service Agreement," were reduced to writing but never signed by the parties. Subsequently, on March 16, 1991, the parties signed a "Buy–Sell Agreement" and a separate real estate contract for the purchase of Metro Auto. This written, signed agreement did not incorporate the terms of the Service Agreement.

By early 1991, the dealerships owed GMAC over $3 million. In order to protect its security interests, on April 3, 1991, GMAC required Nelson to execute agreements referred to as "keeper letters," allowing GMAC significant control over the dealerships. GMAC imposed this requirement as consideration for its agreement to pay in excess of $890,000 in debt owed by Metro Auto and Metro Toyota at the closing of the sale of the dealerships to Elway and Buscher. Nelson knew that execution of these letters would preclude his ability to file for bankruptcy protection and proceed through re-organization. He alleges that he thus sought and received assurances from Elway and Buscher that the orally agreed upon, but as yet unsigned, Service Agreement would be honored.

On April 8, 1991, after the execution of the keeper letters, Pico, Elway, and Buscher met at Pico's office. During this meeting, GMAC telephoned Pico's office and informed Pico, Elway, and Buscher that as a condition to its agreement to finance the acquisition of the land and assets of the dealerships by Elway and Buscher, Nelson was not to receive any proceeds from the sale of the dealerships. The respondents then informed Nelson they would not be able to enter into the Service Agreement with him, and the Service Agreement was therefore not executed at the closing on April 12, 1991. After closing, Nelson demanded that the respondents honor the Service Agreement. When the respondents refused, Nelson filed the instant action.

In his complaint, Nelson sought damages from Elway and Buscher for breach of contract, promissory estoppel, fraud, conspiracy, and dual agency. Additionally, Nelson sought exemplary damages. The respondents then moved the trial court for summary judgment, which the court granted as to all counts. The court of appeals affirmed with respect to all counts except for promissory estoppel. On that claim the court of appeals held there was a genuine issue of material fact and remanded the case to the trial court for trial on that issue alone.

## II.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Cung La v. State Farm Auto. Ins. Co.*, 830 P.2d 1007, 1009 (Colo.1992). The burden to show that there exists no genuine issue of material fact is on the moving party, *id.*, and the court must resolve all doubts as to whether an issue of fact exists against that party. *Id.*

## III.

■ The first issue is whether the court of appeals erred in ruling that the petitioners failed to allege facts sufficient to support the unlawful overt act element of a civil conspiracy claim. The petitioners assert that Pico breached his fiduciary duty, and that this breach constituted the requisite unlawful overt act to give rise to liability for civil conspiracy. The respondents maintain that no valid conspiracy claim exists here because the petitioners failed to show an unlawful overt act. Moreover, the respondents contend that even if Pico breached his fiduciary duty to the petitioners, this is insufficient to impose liability upon the respondents in the absence of evidence that the respondents either committed an unlawful overt act or conspired with Pico to do so. The court of appeals held that:

> the negotiations cited by plaintiffs which allegedly gave rise to a civil conspiracy contain no reference to any unlawful overt acts necessary to support a civil conspiracy. . . .

Here, the parties entered into negotiations which culminated in the signing of the buy-sell agreements and contracts for the sale of real estate. After those negotiations, GMAC informed defendants that Nelson was not to receive any proceeds from the sale, and defendants promptly informed plaintiffs about this condition. There is no evidence that Elway or Buscher engaged in unlawful overt acts in negotiating this sale.

*Nelson*, slip op. at 10.

■ We agree with the court of appeals. To establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result. *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo.1989). The court will not infer the agreement necessary to form a conspiracy; evidence of such an agreement must be presented by the plaintiff. *More v. Johnson*, 193 Colo. 489, 494, 568 P.2d 437, 440 (1977). Additionally, the purpose of the conspiracy must involve an unlawful act or unlawful means. A party may not be held liable for doing in a proper manner that which it had a lawful right to do. *Contract Maintenance Co. v. Local No. 105*, 160 Colo. 190, 194–95, 415 P.2d 855, 857 (1966).

In this case, as was held by the trial and appellate courts, the petitioners alleged no facts giving rise to any unlawful overt act required to support a conspiracy claim. In their brief, the petitioners claim that "Elway and Pico either prompted GMAC or conspired with GMAC to impose an additional condition, eliminating compensation for Nelson." The petitioners' amended complaint, however, is devoid of such an allegation. Indeed, the record contains no support at all for such an assertion.

While the petitioners do allege that Pico, as the agent of Metro Toyota, breached his fiduciary duty to the petitioners, this alone does not give rise to a claim for relief against the respondents. Without an allegation that the respondents committed, or participated in the commission of, an unlawful overt act, conspiracy liability may not be imposed

against them. The record indicates that the respondents negotiated, at arm's length, the best deal they could for the purchase of the dealerships. We decline to impose liability upon the respondents for doing in a proper manner that which they had the lawful right to do: attempt to obtain the most advantageous position for themselves in purchasing the dealerships. We thus hold that the court of appeals correctly affirmed the trial court's entry of summary judgment in favor of the respondents on this issue.

## IV.

The next issue is whether the court of appeals erred in upholding the trial court's entry of summary judgment on the petitioners' claim of breach of contract. The petitioners' claim for breach of contract is based on the alleged March 15, 1991, Service Agreement orally agreed upon by Nelson, Elway and Buscher.

## A.

■ The first issue with regard to the breach of contract claim is whether the merger clauses in the Buy–Sell Agreements precluded the consideration of evidence that the parties intended the Service Agreement to be part of the overall agreement to sell the dealerships.[1] The petitioners argue that the court of appeals erred by ruling that the merger clauses precluded the consideration of the intent of the contracting parties. The respondents assert that the merger clauses wholly manifest the intention of the parties that only those terms of the transaction reduced to writing and signed at the closing would be enforceable terms of the agreement.

■ We agree with the court of appeals that the merger clauses preclude consideration of extrinsic evidence to ascertain the intent of the parties. Integration clauses generally allow contracting parties to limit future contractual disputes to issues relating to the express provisions of the contract. *Keller v. A.O. Smith Harvestore Prods.*, 819 P.2d 69, 72 (Colo.1991). Therefore, the terms of a contract intended to represent a final and complete integration of the agreement between the parties are enforceable, and extrinsic evidence offered to prove the existence of prior agreements is inadmissible. *Id.; Sentinel Acceptance Corp. v. Colgate*, 162 Colo. 64, 66, 424 P.2d 380, 382 (1967). Even when extrinsic evidence is admissible to ascertain the intent of the parties, such evidence may not be used to demonstrate an intent that contradicts or adds to the intent expressed in the writing. *KN Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769, 777 n. 9 (Colo.1985).

In this case, the merger clauses plainly and unambiguously manifest the intent of the parties that the Buy–Sell Agreements executed on March 16, 1991 constitute the entire agreement between the parties pertaining to the subject matter contained therein. Where, as here, sophisticated parties who are represented by counsel have consummated a complex transaction and embodied the terms of that transaction in a detailed written document, it would be improper for this court to rewrite that transaction by looking to evidence outside the four corners of the contract to determine the intent of the parties.

The petitioners and respondents signed the March 16, 1991 Buy–Sell Agreements after extensive negotiation and numerous drafts of documents. By doing so, all parties expressly agreed, pursuant to the merger clauses, that the terms of those Buy–Sell Agreements would control the transaction and that all other agreements, oral or written, would be void. We will not step into a commercial transaction after the fact and attempt to ascertain the intent of the parties when that intent is clearly manifested by an express term in a written document. We thus conclude that the merger clauses in the March 16, 1991, Buy–Sell Agreements are

1. Paragraph 14 of both of the Buy–Sell Agreements (the "Merger Clauses") for Metro Toyota and Metro Auto, both signed on March 16, 1991, by Nelson, Elway, and Buscher, states:

 This Agreement constitutes the entire Agreement between the parties pertaining to the subject matter contained herein, and supersedes all prior agreements, representations and understandings of the parties. No modification or amendment of this Agreement shall be binding unless in writing and signed by the parties....

dispositive as to the intent of the parties in this case. As there is no dispute as to any material fact with regard to this issue, the court of appeals correctly affirmed the trial court's order of summary judgment in favor of the respondents on this issue.

## B.

The next issue with regard to the breach of contract claim is whether the court of appeals erred in ruling that the doctrine of part performance did not bar application of the statute of frauds to preclude the petitioners' breach of contract claim against the respondents based on the alleged oral Service Agreement. In so holding, the court of appeals stated the standard for determining the applicability of the part performance doctrine as follows:

> [A]n oral contract otherwise unenforceable under the statute of frauds may substitute for a writing if there is part performance of the oral contract.... However, such performance must be at least substantial part performance and must be required

by, and referable to, no other theory than that of the alleged oral agreement.

*Nelson*, slip op. at 5 (citations omitted).

The petitioners argue that the court of appeals applied the incorrect standard to determine that the doctrine of part performance was inapplicable here. The respondents contend that the standard applied by the court of appeals was proper, as was the application of that standard to the facts of the case.

■ We agree with the respondents. Section 38–10–112(1)(a), 16A C.R.S. (1982), provides that an oral agreement is unenforceable if, by its terms, it is not to be performed within one year after its formation. *See also McCrea & Co. Auctioneers, Inc. v. Dwyer Auto Body*, 799 P.2d 394, 397 (Colo.App.1989). When applicable, the part performance doctrine operates to preclude the application of the aforementioned statute. *Id.* The part performance doctrine will apply if there is part performance of an oral contract which is: (1) substantial; and (2) required by, and fairly referable to no other theory besides that allegedly contained within the oral agreement. *L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1347 (Colo.App.1986).[2]

---

**2.** The petitioners assert that the requirement articulated in *L.U. Cattle*, and relied upon by the court of appeals in this case, that the part performance "must be required, and referable to, no theory other than that of the oral agreement," is an out-dated and criticized doctrine. This is incorrect. While the petitioner is correct the case relied upon by *L.U. Cattle*, has been criticized by legal encyclopedias, *see, e.g.*, 73 Am. Jur.2d, Statute of Frauds § 408 (1974), that criticism has not gone to the exclusively referable requirement. Specifically, *Knoff v. Grace*, 68 Colo. 527, 190 P. 526 (1920), the case relied upon by *L.U. Cattle*, has been criticized for the erroneous supposition that "the act of part performance must be an actual execution of some express provision or requirement of the contract."

The court of appeals did not cite *L.U. Cattle* for this proposition, nor do we. We simply reaffirm the well established and widely recognized principle that the part performance must be substantial and fairly referable to no other theory than that of the alleged agreement. *Kiter v. Owen*, 115 Colo. 7, 11, 168 P.2d 254, 255 (1946); *Knoff v. Grace*, 68 Colo. 527, 530, 190 P. 526, 528 (1920); *Von Trotha v. Bamberger*, 15 Colo. 1, 12, 24 P. 883, 887 (1890); *L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1347–48 (Colo.App.1986); *see also Glass v. Kirkland*, 29 F.3d 1266, 1271 (8th Cir.1994); *Chevron U.S.A. Inc. v. Schirmer*, 11 F.3d 1473, 1478 (9th Cir.1993); *Sanders v.*

*McMullen*, 868 F.2d 1465, 1467 (5th Cir.1989); *Cinema North Corp. v. Plaza at Latham Assocs.*, 867 F.2d 135, 141 (2d Cir.1989); *Beverly Enterprises, Inc. v. Fredonia Haven, Inc.*, 825 F.2d 374 (11th Cir.1987); *Keller v. Security Fed. Sav. & Loan Ass'n*, 555 So.2d 151, 156 (Ala.1989); *Dunham v. Dunham*, 204 Conn. 303, 528 A.2d 1123, 1130 (1987); *Bear Island Water Ass'n, Inc. v. Brown*, 125 Idaho 717, 874 P.2d 528 (1994); *Knight v. Anderson*, 292 N.W.2d 411, 416 (Iowa 1980); *Unitas v. Temple*, 314 Md. 689, 552 A.2d 1285, 1291 (1989); *Quirin v. Weinberg*, 252 Mont. 386, 830 P.2d 537, 541 (1992); *Sayer v. Bowley*, 243 Neb. 801, 503 N.W.2d 166 (1993); *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 463 N.Y.S.2d 409, 450 N.E.2d 215, 216 (1983); *Skjoldal v. Myren*, 86 S.D. 111, 191 N.W.2d 809, 813 (1971); *Martin v. Scholl*, 678 P.2d 274, 275 (Utah 1983); *Weber v. Weber*, 176 Wis.2d 1085, 501 N.W.2d 413 (1993); *Williston Coop. Credit Union v. Fossum*, 459 N.W.2d 548, 551 (N.D. 1990). The legal encyclopedia cited by the petitioner is also in accord with this proposition. 73 Am.Jur.2d, Statute of Frauds § 406 (1974) ("The acts of part performance, in order to be effective to remove an oral agreement from the operation of the statute of frauds, must be *referable* to and induced by the contract relied upon.... Otherwise there is nothing to show that the plaintiff changed his position to his prejudice because of the contract, so as to give rise to an estoppel") (emphasis added).

This rule is based on the premise that the conduct constituting the partial performance must convincingly evidence the existence of the oral agreement. John D. Calamari & Joseph M. Perillo, *Contracts* § 19–15, at 799 (3d ed. 1987).

In this case, Nelson's conduct does not fulfill the requirements for invocation of the part performance doctrine. The petitioners allege that Nelson's conduct in selling the dealerships constituted part performance of his obligations under the alleged March 15 oral agreement. The petitioners further allege that Nelson engaged in part performance by taking preliminary steps to create a new consulting corporation. The steps allegedly taken were Nelson's selection of a corporate name, Nelson's being "in the process of incorporating," and Nelson's providing information about the corporation to his attorney. This conduct, however, does not meet the requirement of the part performance doctrine that the conduct be fairly referable to no other theory besides that allegedly contained within the oral agreement. Moreover, even assuming arguendo that Nelson's allegations of conduct involving formation of a new corporation were referable to the alleged agreement, it would not be substantial enough to constitute part performance.

■ Here, Nelson's actions in selling the dealerships were referable to the written agreements signed on March 16, and thus cannot constitute part performance of the oral Service Agreement. Because the March 16 written Buy–Sell Agreements required that Nelson sell the dealerships and land to Elway and Buscher, the fact that Nelson actually did so is not probative of the existence of the alleged March 15 oral agreement. Additionally, the fact that Nelson received a commitment from GMAC to pay in excess of $890,000 of the dealerships' debt upon closing of the March 16 written Buy–Sell Agreement is consistent with the existence of the March 16 written agreement rather than the March 15 oral agreement.

■ Moreover, Nelson's allegations of conduct involving formation of a new corporation were not clearly referable to the alleged Service Agreement. Nelson merely alleges in his affidavit accompanying his response to Elway's summary judgment motion that he chose a corporate name, was "in the process" of incorporating, and had spoken to his attorney regarding the alleged Agreement and the new corporation. Such ambiguous conduct falls below the standard set by our cases that conduct must be fairly referable to the alleged contract in order to fall within the part performance exception to the statute of frauds. Moreover, even were we to hold that this conduct on Nelson's part was referable to the alleged Service Agreement, it would still be too insubstantial to trigger application of the part performance doctrine.

We therefore hold that the petitioners failed to establish facts indicating substantial part performance of the alleged Service Agreement, and the court of appeals thus correctly entered summary judgment in favor of the respondents on the ground that the petitioners' breach of contract action was barred by the statute of frauds.

## V.

■ The respondents argue, in their cross-petition, that the court of appeals erred by holding that summary judgment was precluded because genuine issues of material fact exist as to the petitioners' promissory estoppel claim. The respondents urge this court to adopt Restatement (Second) of Contracts § 91, and to hold that the conditional nature of any promise made to the petitioners by the respondents precludes the petitioners' promissory estoppel claim as a matter of law. The petitioners argue that the court of appeals correctly determined that the existence of a genuine issue of material fact with respect to the petitioners' promissory estoppel claim precluded entry of summary judgment in favor of the respondents on that claim.

We agree with the respondents that section 91 is applicable to the facts of this case. We thus reverse the holding of the court of appeals, and hold that the conditional nature of the alleged promise the respondents made to the petitioners regarding the March 15 Service Agreement precludes application of

the promissory estoppel theory embodied in Restatement (Second) of Contracts § 90.

 This court, in *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo.1982), adopted the doctrine of promissory estoppel, articulated in section 90.[3] The elements of a claim for promissory estoppel are: (1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise. The presence of these elements will prevent the lack of a written contract from defeating a plaintiff's claim. *Chidester v. Eastern Gas & Fuel Associates*, 859 P.2d 222, 225 (Colo.App.1992).

 The essence of section 90 is the plaintiff's reasonable reliance on the defendant's representations. Section 91 states:

Effect of Promises Enumerated in §§ 82–90 When Conditional

If a promise within the terms of §§ 82–90 is in terms conditional or performable at a future time the promisor is bound thereby, but performance becomes due only upon the occurrence of the condition or upon the arrival of the specified time.

Section 91 interlocks with section 90, and relates to the reasonableness of the plaintiff's change of position based on promises of the defendant. It would be manifestly unreasonable for a party to rely on a promise that may or may not bind the promisor depending on whether or not a condition occurs. We hold that when a defendant makes a conditional representation to a plaintiff, as contemplated by section 91, any detrimental change of position on the part of the plaintiff prior to the occurrence of the condition is unreasonable as a matter of law.[4] This holding is consistent with prior Colorado cases which hold that promissory estoppel may not lie where the asserted reliance is not justified or reasonable. *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo.1983); *Hansen v. GAB Business Servs., Inc.*, 876 P.2d 112, 114 (Colo.App.1994).

In this case, the promise upon which the petitioners purport to rely as grounds for their promissory estoppel claim is the alleged March 15 oral Service Agreement. This promise was made expressly conditional on GMAC's approval of the sale. In this regard, the court of appeals stated:

According to Nelson, on March 15, 1991, Elway and Buscher agreed that if the sale could be structured so Elway's cash investment would be limited to $1.2 million, and *if General Motors Acceptance Corporation (GMAC) approved of the sale*, then Elway and Buscher would buy the dealerships and Nelson would receive his compensation through the Service Agreement.

*Nelson*, slip op. at 10 (emphasis added). This is consistent with Nelson's affidavit sworn on November 24, 1992 in which he stated:

I agreed with Mr. Elway and Mr. Buscher on March 15, 1991, that if a sale of my Dealerships' assets and my land could be structured so that Mr. Elway's cash investment was limited to 1.2 million dollars, and *if Mr. Elway and Mr. Buscher could obtain GMAC approval of the Agreement*, then Mr. Elway and Mr. Buscher would buy both of my Dealerships and the land upon which they were located, and I would receive, through a separate side deal agreement, $50.00 for every new or used retail vehicle sold by the Dealerships for the next seven years commencing May 1, 1991.

Nelson Aff. at ¶ 12.

This demonstrates not only that the alleged oral Service Agreement of March 15

---

3. Section 90 states in pertinent part:

Promise Reasonably Inducing Action or Forbearance

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding only if injustice can be avoided only by enforcement of the promise.

The remedy granted for breach may be limited as justice requires.

4. This holding is in accord with other jurisdictions which have considered and adopted section 91. *See, e.g., Corbit v. J.I. Case Co*, 70 Wash.2d 522, 424 P.2d 290, 301 (1967) (adopting section 91 and reversing promissory estoppel based judgment against defendant where promise upon which that claim was based was conditional).

was conditioned on GMAC approval, but also that Nelson was aware of the conditional nature of the promise. We thus hold, as a matter of law, that it was unreasonable for Nelson to rely upon the alleged representations made to him by Elway and Buscher on March 15. We thus reverse the court of appeals' ruling on this issue and remand for proceedings consistent with this opinion.

## VI.

For the foregoing reasons, the court of appeals is reversed in part and affirmed in part. The case is thus remanded to the court of appeals with directions to remand to the trial court to enter judgment in favor of the respondents.

LOHR, J., dissents, and KIRSHBAUM and SCOTT, JJ., join in the dissent.

Justice LOHR dissenting:

Petitioners Mel T. Nelson and Metro Auto, Inc. (collectively "Nelson") appealed a trial court ruling dismissing their claims on summary judgment grounds. The Colorado Court of Appeals affirmed the trial court's dismissal of all of Nelson's claims except a claim based on promissory estoppel. *Nelson v. Elway*, No. 93CA0629 (Colo.App. May 26, 1994) (not selected for official publication). On certiorari review in this court, the majority holds that Nelson's civil conspiracy, breach of contract, and promissory estoppel claims were all properly dismissed by the trial court on summary judgment.

I respectfully dissent. Summary judgment is a severe remedy. As the majority notes, in summary judgment proceedings courts must resolve all doubts as to the existence of genuine issues of material fact against the moving party. Maj. op. at 105. In view of the record and the procedural posture of this case, I would hold that Nelson's civil conspiracy, breach of contract, and promissory estoppel claims were improperly

dismissed. I would therefore reverse the judgment of the court of appeals upholding dismissal of the civil conspiracy and breach of contract claims, and would affirm the judgment of that court overturning the dismissal of the promissory estoppel claim.

## I.

The following facts are derived from the record in this case, resolving all doubts against the party moving for summary judgment, as we must. *See infra* part II. Mel T. Nelson was the president and sole shareholder of both Metro Toyota, Inc. ("Metro Toyota") and Metro Auto, Inc. ("Metro Auto"). Nelson also owned the land upon which the dealerships were located. Although Metro Auto was historically profitable, Metro Toyota was less successful. After hiring John J. Pico and Aspen Brokerage Co. (collectively "Pico") to serve as his agent and negotiator, Nelson agreed to sell Metro Toyota to John A. Elway, Jr., Rodney L. Buscher, J.R. Motors Company, and J.R. Motors Company South (collectively "Elway").[1] The parties signed buy-sell and real estate contracts for the Metro Toyota concern on March 14, 1991, and set a closing date in April of 1991.

Soon after the Metro Toyota contracts were executed, Pico approached Nelson with the idea of selling Metro Auto to Elway as well. The parties agreed that any successful deal would have to meet two conditions: John A. Elway's total cash contribution would have to be limited to approximately $1.2 million dollars, and Nelson would have to receive enough personal compensation to make a sale of the historically profitable Metro Auto worthwhile. On March 15, 1991, Elway and Nelson agreed that if Nelson made the up-front concessions envisioned by Elway regarding the sale price for the real estate and dealership assets, Nelson would receive deferred personal compensation through a side agreement ("service agree-

---

1. Although J.R. Motors Company and J.R. Motors Company South were not parties to the agreement with Nelson, Nelson alleged in his complaint that:

 Prior to the finalization of the sale and purchase of the Dealerships and the land upon which they were located, Defendants Elway

and Buscher assigned all rights and obligations under the Buy–Sell Agreement to J–R Motors Company and to J–R Motors Company South. Based upon this assertion in the complaint, the trial court refused to dismiss the claims against J.R. Motors Company and J.R. Motors Company South.

ment") providing that Nelson was to receive $50.00 for every new or used vehicle sold by the dealerships for the next seven years. Both buy-sell agreements noted that sale of the dealerships was contingent on GMAC approval. The parties subsequently signed buy-sell and real estate contracts for Metro Auto on March 16, 1991.

Anticipating the pending sale of the dealerships, GMAC insisted that Nelson relinquish control over the dealerships on April 3, 1991. Since Nelson and Elway had yet to sign the service agreement, Nelson contacted Rodney L. Buscher and received assurances that the service agreement would be honored before relinquishing control to GMAC.

On April 8 or 9, 1991, Pico and Elway met at the Landmark Hotel to discuss the sale of Nelson's dealerships. During the meeting, GMAC called Pico and told Elway that they would not finance the deal if Elway signed a side agreement with Nelson. Despite Nelson's understanding that Elway would honor the service agreement, Elway informed Nelson on April 8 or 9, 1991, that the service agreement would not be signed.

The parties disagree as to why Elway did not sign the service agreement. Elway contends that GMAC refused to approve the sale if the service agreement was executed. Nelson, on the other hand, alleges that Pico and Elway prompted GMAC to impose such conditions. Nelson suggests that Pico was interested in sabotaging the service agreement because of a fee dispute between Pico and Nelson. Nelson further contends that Elway realized that even if a portion of the money earmarked for the service agreement was diverted to pay Pico a commission, the total payout under any side agreements would be less if Nelson's compensation under the service agreement was eliminated. Nevertheless, Nelson proceeded with the sale of the dealerships because he already had turned control over to GMAC and thereby eliminated a bankruptcy reorganization alternative that was previously under consideration.

The parties' present dispute revolves around the enforceability of the service agreement. The district court dismissed Nelson's claims in a summary judgment proceeding, and the court of appeals affirmed in part but reversed as to Nelson's promissory estoppel claim. The court of appeals held that there were "genuine issues of material fact precluding the entry of summary judgment on [Nelson's] claim for promissory estoppel." *Nelson*, slip op. at 11. Nelson then petitioned this court for certiorari review of the court of appeals' affirmance of the trial court's summary judgment ruling regarding his civil conspiracy and breach of contract claims, and Elway cross-petitioned regarding the court of appeals' ruling on Nelson's promissory estoppel claim.

## II.

Summary judgment is a "drastic remedy." *Rael v. Taylor*, 876 P.2d 1210, 1228 (Colo. 1994); *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1339 (Colo.1988). C.R.C.P. 56(c) requires that the moving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" before a court can grant a summary judgment motion. C.R.C.P. 56(c). Furthermore, in determining whether summary judgment is proper, the nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts as to the existence of a disputed material fact must be resolved against the moving party. *Jafay v. Board of County Comm'rs*, 848 P.2d 892, 900 (Colo.1993); *Cung La v. State Farm Auto Ins. Co.*, 830 P.2d 1007, 1009 (Colo.1992); *Churchey*, 759 P.2d at 1340. Where reasonable people could disagree as to material facts, summary judgment is inappropriate. *Jafay*, 848 P.2d at 900.

## III.

I address Nelson's claims in the order of resolution by the majority, beginning with the dismissal of the civil conspiracy claim. Nelson contends that Elway conspired with Pico to undermine Pico's fiduciary duty to Nelson during the negotiations surrounding the service agreement. The majority affirms the summary judgment ruling with respect to Nelson's civil conspiracy claim, holding that it will not "infer" an agreement between

Elway and Pico to undermine Pico's fiduciary duty where "the petitioners alleged no facts giving rise to any unlawful overt act required to support a conspiracy claim." Maj. op. at 106.

In view of the record and the summary judgment posture of this case, I respectfully disagree. First, the court of appeals is incorrect that Elway could not have engaged in the requisite unlawful act as a matter of law. Second, the record contains sufficient undisputed material facts to support the inference that Elway colluded with Pico to undermine Pico's fiduciary duty to Nelson. Finally, even if Nelson's allegation that Elway colluded with Pico to undermine Pico's fiduciary duty to Nelson is a matter in dispute, summary judgment is inappropriate where reasonable parties could disagree on the material facts of the case.

Elway's engagement in an unlawful act for civil conspiracy purposes was not precluded as a matter of law. A civil conspiracy claim requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as the proximate result thereof. *Jet Courier Inc. v. Mulei,* 771 P.2d 486, 502 (Colo.1989). To support a civil conspiracy claim, Elway must have either committed an unlawful act, *id.* at 502, or engaged in a concerted effort or agreement with another conspirator to pursue some unlawful action. *See, e.g., United States v. Kane,* 23 F. 748, 751 (C.C.D.Colo. 1885); *Huckleberry v. M.C. Dixon Lumber Co., Inc.,* 503 So.2d 1209, 1210–11 (Ala.1987); *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 150 (Del. 1987).

In fact, as long as there is a "concert of action" or "an agreement to do some unlawful thing," and the alleged conspirators meet "to carry that purpose into effect, then every man, by virtue of uniting in that preconceived purpose to do the unlawful thing, makes himself responsible for what any one does." *Kane,* 23 F. at 751, 752; *see also Ex parte Richards,* 117 F. 658, 666–67 (C.C.S.D.W.Va.1902) (citing *Kane* approvingly); *United States v. Weber,* 114 F. 950, 953 (C.C.W.D.Va.1902) (if an otherwise legal group employs illegal methods, "the persons

who combine in such efforts are conspirators," and it is a "well-settled doctrine that each of the confederates is liable for all such illegal acts of the others as may be reasonably anticipated as incidental to the intended act"); *United States v. Sweeney,* 95 F. 434, 451 (C.C.W.D.Ark.1899) (citing *Kane* for the proposition that "where a party of men combine with the intent to do an unlawful thing, and in the prosecution of the unlawful intent one of the party goes a step beyond the balance of the party, and does acts which the balance do not themselves perform, all are responsible for what the one does"); *Huckleberry,* 503 So.2d at 1210–11; *Southern Cal. Iron & Steel Co. v. Amalgamated Ass'n of Iron, Steel & Tin Workers,* 186 Cal. 604, 200 P. 1, 3 (1921) (quoting 12 Corpus Juris, 610 in holding that " '[w]here two or more persons enter into a conspiracy, any act done by either in furtherance of the common design and in accordance with the general plan becomes the act of all, and each conspirator is responsible for such act. This is true even though the results were not specifically intended or the means specifically agreed on.' "); *Nicolet,* 525 A.2d at 150. In sum, " 'one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty [civil conspiracy] participant, and in the eye of the law is equally guilty with the one who does the [unlawful] act.' " *Huckleberry,* 503 So.2d at 1211 (quoting *Stokley v. State,* 254 Ala. 534, 49 So.2d 284, 291 (1950)).

Elway did not owe a fiduciary duty to Nelson. Nevertheless, Pico owed a fiduciary duty to Nelson as his agent and representative, and a breach of that fiduciary duty satisfies the unlawful act element of a civil conspiracy charge. *See Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049, 1056 (Colo.1995) ("a breach of the fiduciary duty is a tortious act which satisfies the element of unlawful act associated with the definition of civil conspiracy"); *Jet Courier,* 771 P.2d at 502. Nelson contends that Pico violated this fiduciary duty when he allegedly negotiated with Elway and GMAC to precondition GMAC approval on a disavowance of the service agreement in return for Elway's

agreement to provide Pico with a fee garnered from funds that were previously earmarked for Nelson. Although Pico and Elway may have met to discuss a variety of otherwise legal considerations, the record supports an inference that they decided to create an alternative fee arrangement where Pico would be paid by Elway to the detriment of Nelson, creating an illegal dual-agency situation and a breach of Pico's fiduciary duty. Albeit true that Elway never breached a fiduciary duty owed directly to Nelson, he may be responsible for his alleged collusion in Pico's breach of fiduciary duty. *See Kane*, 23 F. at 751, 752.

Nelson's civil conspiracy complaint contained undisputed facts supporting the inference that Elway did indeed engage in a collusive breach of Pico's fiduciary duty to Nelson. Although the majority purports to apply our well-defined summary judgment standard, it curiously notes that Nelson's complaint was "devoid" of any allegation that Elway conspired with Pico to breach Pico's fiduciary duty to Nelson. Maj. op. at 106. I disagree.

There is ample evidence in the record of allegations that Elway actively abetted and participated in Pico's breach of fiduciary duty. The allegations appear in the complaint and amended complaint and are reaffirmed by Nelson in an affidavit filed in response to Elway's motion for summary judgment. In his initial complaint, Nelson alleged that Pico breached his fiduciary duty by dividing his loyalty between Nelson and Elway and negotiating a fee arrangement with Elway to the detriment of Nelson.[2] Specifically, Nelson asserted:

Defendants Pico and Pico Corporation breached their fiduciary duties to [Nelson] through the following acts and omissions, without limitation: ... (c) by dividing their loyalty between [Nelson] and Defendants Elway and Buscher; (d) by negotiating the Pico Consulting Agreement with Defendants Elway and Buscher, during the course of negotiations for the sale and purchase of the Dealerships and the real property upon which they were located, and formalizing such agreement after [Nelson] was committed to going forward with the sale of the Dealerships and the property upon which they were located.

Nelson's breach of fiduciary duty claims incorporated even more specific contentions that Elway and Pico agreed to divert proceeds to Pico that were otherwise earmarked for Nelson:

Defendants Elway and Buscher refused to honor their promise to enter into a separate Service Agreement with Plaintiff and to pay [Nelson] Fifty Dollars ($50.00) per car under the Service Agreement, but instead agreed to pay a portion of the money which they had committed to pay to [Nelson] to [Nelson's] broker, Pico Corporation, in the form of a Seven Hundred Forty Thousand Dollar ($740,000.00) fee payable at the rate of Fifty Dollars ($50.00) per car.

Nelson also took care to incorporate these allegations into his conspiracy claim, describing the aforementioned contentions as "combined and concerted actions," which "constituted unlawful acts and/or lawful acts accomplished by unlawful means."

Furthermore, in his amended complaint Nelson again emphasized Elway's participation in Pico's breach of fiduciary duty:

Although they acted as Plaintiff's broker and agent, Defendants Pico and Pico corporation also acted as the agent and broker for Defendants Elway and Buscher in the same transaction and worked closely with Defendants Elway and Buscher in negotiations with GMAC which led to a greatly reduced purchase price for the Dealerships and land.

Nelson clarified in his amended complaint his allegation that instead of honoring his service agreement with Nelson, Elway "diverted the sum of Fifty Dollars ($50.00) per retail car sold to pay Pico Corporation a Seven Hun-

---

2. It is irrelevant that Pico may have taken steps to breach his fiduciary duty to Nelson before Elway began his allegedly collusive involvement. *United States v. Brown*, 755 F.Supp. 942, 946 (D.Colo.) ("A party may join or leave an ongoing conspiracy during its progress and thus become criminally liable for all acts done in furtherance of the scheme."), *aff'd*, 930 F.2d 35 (10th Cir. 1991).

dred Forty Thousand Dollar ($740,000.00) fee."

Lastly, Nelson supported the allegations in his complaint and amended complaint in his response to Elway's summary judgment motion:

> Defendant GMAC allegedly called Defendant Buscher, in the presence of Defendants Elway and Pico and informed Defendant Buscher that its approval of the Buy-Sell Agreement, and its willingness to finance the sales transaction was contingent upon there being no side deal agreement with Defendant Nelson. Instead, Defendants Elway and Buscher used the alleged GMAC financing requirement as an excuse for not performing that portion of their agreement with Nelson pursuant to which Nelson was to be compensated.

> By 12:20 p.m. on April 8, 1991, Defendants Elway and Buscher were discussing paying Nelson's agent, Defendant Pico, a portion of the same $50.00 per retail vehicle sold, which had originally been promised to Nelson, as Defendant Pico's commission.

> The difference was that instead of paying Nelson a sum which was anticipated to be at least $2,100,000.00 at $50.00 per retail vehicle sold over a period of seven years, Defendants Elway and Buscher were discussing paying Defendant Pico an additional $370,000.00 at $50.00 per retail vehicle sold.

> As is more fully developed in Section G, herein, the alleged GMAC financing contingency, and the use of the alleged GMAC financing contingency to avoid paying Nelson the compensation to which he was entitled, in favor of paying a substantially lesser total amount, at the rate of $50.00 per retail vehicle sold, to Nelson's agent, Defendant Pico, supports a civil conspiracy claim against all Defendants.

(citations omitted). All of the factual statements in Nelson's response to Elway's summary judgment motion were adopted in Nelson's attached affidavit.

The majority states that it will not "infer" that Elway and Pico agreed to compensate Pico to the detriment of Nelson, creating a dual agency situation in breach of Pico's fiduciary duty. Maj. op. at 106. However, a court must give the nonmoving party the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts. *Cung La*, 830 P.2d at 1009; *Jafay*, 848 P.2d at 900; *Churchey*, 759 P.2d at 1340. In his brief in support of summary judgment, Elway never contested Nelson's claims that Pico breached his fiduciary duty to Nelson in concert with Elway, resting his summary judgment argument on other grounds:

> The required "wrong doing" or "illegality" to support [Nelson's] claims for conspiracy and punitive damages are the allegations in support of the claims of breach of contract, promissory estoppel and fraud. As explained above, these claims are not supportable. Thus, there is no "illegal" conduct by these Defendants, and summary judgment should enter on [Nelson's] claims for civil conspiracy and punitive damages.

Nelson's allegations that Pico breached a fiduciary duty in collusion with Elway were uncontroverted. In view of the uncontroverted allegations of fact, Nelson was entitled to the inference that Elway colluded with Pico to breach Pico's fiduciary duty to Nelson for summary judgment purposes.

Lastly, even if Elway had controverted Nelson's allegations of fact concerning the fiduciary duty issue, issues of material fact would by definition remain. *See, e.g.*, *Huckleberry*, 503 So.2d at 1211 (court holds that "'[t]he jury is to determine whether [collusion in an unlawful act] exists, and the extent of it, from the conduct of the parties and all the testimony in the case'" in reversing a trial court's grant of summary judgment on a civil conspiracy claim based on collusion) (quoting *Stokley*, 49 So.2d at 291). I would hold that Nelson satisfied his burden of raising issues of material fact with regard to Elway's alleged involvement in Pico's breach of fiduciary duty, and any resultant civil conspiracy liability that would stem from that unlawful act. Considering the record and the summary judgment posture of this case, I would hold that material issues of fact remain regarding Elway's alleged collusion in Pico's breach of fiduciary duty such that summary judgment is improper.

## IV.

Nelson also contends that Elway is liable for breach of contract in failing to honor the service agreement. The majority affirms the dismissal of Nelson's breach of contract claim on summary judgment, holding (1) that the merger clauses in the buy-sell agreements preclude consideration of the alleged service agreement, and (2) that the statute of frauds prohibits a breach of contract claim based on the alleged oral service agreement, and that the doctrine of part performance does not bar application of the statute of frauds to this case. I disagree with the majority on both of these issues.

First, merger clauses preclude consideration of extrinsic evidence only where the parties intend that the document containing the merger is exclusive. *ARB, Inc. v. E–Systems, Inc.*, 663 F.2d 189, 199 (D.C.Cir. 1980); *Darner Motor Sales v. Universal Underwriters*, 140 Ariz. 383, 393, 682 P.2d 388, 398 (1984); *Anderson & Nafziger v. G.T. Newcomb, Inc.*, 100 Idaho 175, 180, 595 P.2d 709, 714 (1979); *Sutton v. Stacey's Fuel Mart, Inc.*, 431 A.2d 1319, 1323 n. 3 (Me. 1981). The very essence of this case is a dispute regarding whether the parties intended the service agreement to be part and parcel of the overall deal. Because Nelson's position is adequately supported in the record, the intention of the parties regarding the exclusivity of the document containing the merger agreement is a disputed issue of material fact. As a result, this case is inappropriate for summary judgment disposition. *See e.g., Jafay*, 848 P.2d at 900.

Second, the statute of frauds is a limited defense that is inapplicable where partial performance of an alleged oral agreement occurs. *Ridgeway v. Pope*, 163 Colo. 160, 163, 430 P.2d 77, 78 (1967); *Siler v. Investment Co.*, 125 Colo. 438, 445, 244 P.2d 877, 881 (1952). The parties are in dispute as to whether part performance of the alleged service agreement did indeed occur. Considering the significant and salient factual issues on which the parties continue to disagree, summary judgment should not have been granted. *See, e.g., Jafay*, 848 P.2d at 900.

## A.

Nelson and Elway disagree regarding their intent to honor the alleged service agreement. The majority contends that the merger clauses in the buy-sell agreements affirmatively preclude consideration of extrinsic evidence such as the alleged oral service agreement, and refuses to look at "evidence outside the four corners of the contract to determine the intent of the parties."[3] Maj. op. at 107. However, the "four corners" approach to contract interpretation is in decline. John D. Calamari & Joseph M. Perillo, *Contracts* § 3–4, at 145–46 (3d ed. 1987); *cf.* II E. Allan Farnsworth, *Farnsworth on Contracts* § 7.3, at 206 (1990); 3 Lawrence A. Cunningham & Arthur A. Jacobson, *Corbin on Contracts* § 579, at 558 (1994 Supp.) ("Confining judges to the 'four corners' of the contract and 'objective' definitions of words led to very haphazard and unjust results, so that an entire body of exceptions, corollaries, practices, and fictions sprung up to work some flexibility into the process."). The "modern trend," *Darner*, 140 Ariz. at 393, 682 P.2d at 398, is that merger and integration clauses are to be afforded varying weight depending on the circumstances of the case. *Franklin v. White*, 493 N.E.2d 161, 166 (Ind.1986); *see also ARB*, 663 F.2d at 199 (court must consider "the circumstances surrounding the making of the contract" to ascertain whether an integration clause serves to "express the genuine intention of the parties to make the written contract the complete and exclusive statement of their agreement"); *Darner*, 140 Ariz. at 393, 682 P.2d at 398 ("Evidence on surrounding circumstances, including negotiation, prior understandings, subsequent conduct and the like, is taken to determine the parties' intent with regard to integration of the agreement.... This method obtains even though

---

**3.** The merger clauses in the buy-sell agreements for Metro Toyota and Metro Auto were identical, and read:

> This Agreement constitutes the entire Agreement between the parties pertaining to the subject matter contained herein, and supersedes all prior agreements, representations and understandings of the parties. No modification of this Agreement shall be binding unless in writing and signed by the parties....

the parties have bargained for and written the actual words found in the instrument."); *Anderson*, 100 Idaho at 180, 595 P.2d at 714 (courts "should consider not only the language of the agreement but all extrinsic evidence relevant to the issue of whether the parties intended the written agreement to be a complete integration"); Restatement (Second) of Contracts § 209(2) (1979) ("Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule."); Restatement (Second) of Contracts § 210 cmt. b (1979) (for purposes of proving a complete integration, "a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties"); *cf. Whitney v. Halibut, Inc.*, 235 Md. 517, 202 A.2d 629, 634 (1964) ("an integration clause is not necessarily conclusive"); *Sutton*, 431 A.2d at 1323 n. 3 ("A merger clause does not control the question of whether a writing was intended to be a completely integrated agreement."); *Neville v. Scott*, 182 Pa.Super. 448, 127 A.2d 755, 757 (1956) ("integration clause is not controlling"); 3 Arthur Linton Corbin, *Corbin on Contracts* § 578, at 405–06, 406 n. 43 (1960 & 1994 Supp.). As the United States Supreme Court describes, "even a written contractual provision declaring that the contract contains the complete agreement of the parties, and that no antecedent or extrinsic representations exist, does not conclusively bar subsequent proof that such additional agreements exist and should be given force." *Blackledge v. Allison*, 431 U.S. 63, 75 n. 6, 97 S.Ct. 1621, 1630 n. 6, 52 L.Ed.2d 136 (1977).

Although I believe that merger and integration clauses are presumptively valid, in keeping with the honored tenets of contract law there is an exception such that "[w]here giving effect to the merger clause would frustrate and distort the parties' true intentions and understanding regarding the contract, the clause will not be enforced." *Zinn v. Walker*, 87 N.C.App. 325, 361 S.E.2d 314, 319 (1987). In particular, where the parties intend that both a written contract and an alleged oral agreement constitute compo-

nents of an overall agreement, a merger clause does not preclude consideration of extrinsic evidence. *See Coulter v. Anderson*, 144 Colo. 402, 410, 357 P.2d 76, 80 (1960) ("[w]here it is shown that a writing was not intended to be fully integrated, terms other than those set forth in the writing may be proved by parol evidence" even though "nothing appears on [the written document's] face rendering it incomplete"); *see also Bill Dreiling Motor Co. v. Shultz*, 168 Colo. 59, 66, 450 P.2d 70, 73 (Colo.1969) (court allows evidence of oral agreement despite contract "provision reciting that it contained all the terms thereof and that all representations of the defendant were contained therein," where the alleged oral agreement "was inseparably interwoven in the whole transaction"); *Fleming v. Scott*, 141 Colo. 449, 451–52, 348 P.2d 701, 702 (1960); Restatement (Second) of Contracts § 216 cmt. e (1979) ("a [merger and integration] clause does not control the question whether the writing was assented to as an integrated agreement, the scope of the writing if completely integrated, or the interpretation of the written terms"); 3 Corbin, *Corbin on Contracts* § 578, at 407, § 580, at 431. As we noted in *Keller v. A.O. Smith Harvestore Prods.*, " 'a seller should not be allowed to hide behind an integration clause to avoid the consequences of a misrepresentation.' " 819 P.2d 69, 73 (Colo.1991) (quoting *Formento v. Encanto Bus. Park*, 154 Ariz. 495, 499, 744 P.2d 22, 26 (Ct.App. 1987)).

The parties' intention that the buy-sell agreements constituted entire contracts, allegedly evidenced by the merger clauses within, was by no means clearly manifested. *See Sierra Diesel Injection Serv. v. Burroughs Corp.*, 874 F.2d 653, 657 (9th Cir. 1989) ("the presence of a merger clause while often taken as a strong sign of the parties' intent is not conclusive in all cases"). In this case, despite the disclaimer in both merger clauses that each buy-sell agreement constituted the entire agreement, the overall deal involved two buy-sell agreements and two real estate contracts. Furthermore, each buy-sell agreement made reference to the real estate contracts despite the exclusivity disclaimer. Regardless of the standard

merger and integration language in the buy-sell agreements, it is clear that the parties intended their ultimate bargain to encompass other agreements, although the substantive weight of the alleged service agreement remains unclear. *See Gem Corrugated Box Corp. v. National Kraft Container Corp.*, 427 F.2d 499, 502–03 (2d Cir.1970) ("The contract price was not attractive; consummation of the stock purchase agreement was the real inducement to enter into the requirements contract.... [I]t was the vital element of the overall transaction. Viewed in this proper perspective, it is plain that the provision in the requirements contract that it contains the entire agreement of the parties means that the writing contains the entire agreement as to its limited subject matter alone; ...").

When the parties disagree as to whether a document expresses the complete agreement of the parties, and a court subsequently finds that the evidence is conflicting or admits of more than one inference, the resolution of the parties' dispute requires a factual determination. *See Sierra*, 874 F.2d at 657 (integration is a factual question); *Franklin*, 493 N.E.2d at 167 ("preliminary question of integration ... requires the court to hear all relevant evidence, parol or written"); *Sutton*, 431 A.2d at 1322 n. 3 ("The determination of whether the parties intended a writing to be totally integrated must be based upon *all* the relevant evidence.") (emphasis in original); *see also* Restatement (Second) of Contracts § 209 cmt. c (1979) ("Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accordance with all relevant evidence."); 3 Corbin, *Corbin on Contracts* § 578, at 411 ("A statement in the writing that it contains all terms agreed upon and that there are no promises, warranties, or other extrinsic provisions, is a statement of fact that may actually be untrue."). In this case, the intention of the parties regarding the scope of the contract is a factual dispute that must be resolved in favor of the non-moving party for summary judgment purposes. *See, e.g., Holt v. Katsanevas*, 854 P.2d 575, 579 (Utah Ct.App.1993) (dispute over the scope of an oral agreement

is a factual question not suited for summary judgment).

### B.

The court of appeals held that the part performance doctrine permits the enforcement of an oral agreement under limited circumstances as an exception to the statute of frauds. *Nelson*, slip op. at 5. In particular, the court of appeals required that "such performance must be at least substantial part performance and must be required by, and referable to, no theory other than that of the alleged oral agreement." *Id.* (citing *L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1347–48 (Colo.App.1986)). The majority endorses the application of the *L.U. Cattle* standard, based on the rationale that "the conduct constituting the partial performance must convincingly evidence the existence of the oral agreement." Maj. op. at 108 (citing John D. Calamari & Joseph M. Perillo, *Contracts* § 19–15, at 799 (3d ed. 1987)). Because Nelson's conduct in selling the dealerships is attributable to the written buy-sell agreements, the majority concludes that the part performance doctrine is inapplicable and that Nelson's breach of contract claim is barred by the statute of frauds. Maj. op. at 108–109.

I disagree. First, although I concur that part performance must be substantial to have any probative effect, I would not adopt the oft-criticized *L.U. Cattle* standard and require that the part performance be attributable to no theory other than that of the alleged oral agreement. *See L.U. Cattle*, 714 P.2d at 1347–48 (citing *Knoff v. Grace*, 68 Colo. 527, 531, 190 P. 526, 528 (1920)). Second, even assuming that the *L.U. Cattle* standard is appropriate, the majority misconstrues the actions that Nelson alleges he has taken in furtherance of part performance and as a result misapplies the *L.U. Cattle* standard.

Nelson's part performance of the alleged oral service agreement may warrant an exception from the statute of frauds defense, depending upon the resolution of disputed issues of fact.[4] "[P]art performance of a

4. Section 38–10–112 requires that "[e]very agreement that by the terms is not to be per-

contract ... effectively removes it from the bar of the Statute of Frauds." *Ridgeway,* 163 Colo. at 163, 430 P.2d at 78; *accord Siler,* 125 Colo. at 445, 244 P.2d at 881; *Ralston Oil & Gas Co. v. July Corp.,* 719 P.2d 334, 339 (Colo.App.1985) ("An oral contract otherwise unenforceable under the statute of frauds may substitute for a writing if there is part performance of the oral contract."); *Walk v. Miller,* 650 P.2d 1286, 1287 (Colo. App.1981) (same). Exceptions to the statute of frauds defense stem "from a desire to prevent the statute of frauds from being used as a shield which would otherwise allow a party to be unjustly enriched." *Ralston,* 719 P.2d at 339; *see also Burnford v. Blanning,* 33 Colo.App. 444, 448, 525 P.2d 494, 497 (Colo.App.1974), *rev'd on other grounds,* 189 Colo. 292, 540 P.2d 337 (1975).

Nelson is entitled to invoke the part performance doctrine to support his breach of contract claim, in responding to the statute of frauds argument in Elway's summary judgment motion. In order to rely on the part performance doctrine, the alleged part performance must be substantial. *Siler,* 125 Colo. at 445, 244 P.2d at 881; *L.U. Cattle,* 714 P.2d at 1347. However, the majority does not reach the question of the substantiality of Nelson's alleged part performance. *See* maj. op. at 109–110. Instead, the majority concurs with the judgment of the court of appeals, *Nelson,* slip op. at 6, and concludes that Nelson's alleged part performance "in selling the dealerships" is attributable to execution of the written buy-sell agreements and therefore cannot support a part performance argument in view of the *L.U. Cattle* requirement that the conduct be fairly referable to no theory other than that allegedly contained within the oral agreement. Maj. op. at 109; *see L.U. Cattle,* 714 P.2d at 1347–48. Because I would not adopt this latter qualifier to the part performance doctrine, I believe that the grant of summary judgment regarding Nelson's breach of contract claim was premature considering the parties' disagreement over the factual questions of (1) whether Nelson's alleged part performance was substantial enough to overcome a statute of frauds defense, *see Adcock v. Lieber,* 51 Colo. 373, 376, 117 P. 993, 994 (1911) (alleged part performance is in part a question of fact); *Boesiger v. Freer,* 85 Idaho 551, 553, 381 P.2d 802, 804 (1963) ("[w]hat constitutes part performance must depend [in part] upon the particular facts of each case"); *Blasingame v. American Materials, Inc.,* 654 S.W.2d 659, 663 (Tenn.1983) (existence of partial performance is in part a factual determination), and (2) whether Elway induced Nelson, through the alleged oral commitment, to sign the buy-sell agreements. *See Ralston,* 719 P.2d at 339 (inducement is a question of fact).

The *L.U. Cattle* requirement that the alleged part performance be fairly referable to no other theory besides that contained within the alleged oral agreement is an unfortunate embellishment on traditional part performance principles.[5] Criticizing *Knoff,* the case relied upon by the court in *L.U. Cattle,* 714 P.2d at 1347–48, one commentator states that the "generally prevailing view" in this country *does not* require that the alleged part performance be fairly attributable to no theory other than that contained within the alleged oral agreement. 73 Am.Jur.2d *Statute of Frauds* § 408 (1974 & 1995 Supp.). Instead:

> The plaintiff must show that in reliance on the contract, he has proceeded, either in performance or pursuance of it, so far to alter his position as to incur an unjust and unconscientious injury and loss in case the defendant is permitted to rely upon the [statute of frauds] defense. But this change of situation is not confined to doing what the contract stipulated—that is, "part

---

formed within one year after the making thereof" is void, "unless such agreement or some note or memorandum thereof is in writing and subscribed by the party charged therewith." § 38–10–112, 16A C.R.S. (1982) ("statute of frauds").

**5.** To the extent that *Kiter v. Owen,* 115 Colo. 7, 11, 168 P.2d 254, 255 (1946), *Knoff v. Grace,* 68 Colo. 527, 530, 190 P. 526, 528 (1920), *Von Trotha v. Bamberger,* 15 Colo. 1, 12, 24 P. 883, 887 (1890), *L.U. Cattle Co. v. Wilson,* 714 P.2d 1344, 1347–48 (Colo.App.1986), and *WCN v. Tosh Okano Communications, Inc.,* 513 P.2d 1070, 1072 (Colo.App.1973) (not selected for official publication) require that part performance be fairly referable to no other theory besides that contained within the alleged oral agreement, I would decline to follow their precedent.

performance" in the literal sense of that term.

*Id.; see also* Annotation, *Doctrine of Part Performance in Suits for Specific Performance of Parol Contract to Convey Real Property,* 101 A.L.R. 923, 962–63 (1936) (quoting *Brown v. Hoag,* 35 Minn. 373, 29 N.W. 135, 137 (1886), for the same proposition). Another commentator describes the *Knoff* requirement as "inconsistent with the great mass of cases in which the doctrine of part performance has been applied." *Doctrine of Part Performance,* 101 A.L.R. at 962–63. The part performance doctrine is based in large part on the possibility of fraud, inducement and a subsequent reliance. *See Brown,* 29 N.W. at 137. Because the *Knoff* standard reiterated in *L.U. Cattle,* 714 P.2d at 1347–48, gives no effect to a determination that partial performance was procured through misrepresentations or other fraudulent means, the standard is a poor embodiment of the traditional principles underlying the part performance doctrine. I would hold instead that the part performance doctrine is triggered for statute of frauds purposes where the plaintiff has relied upon alleged oral inducements such that enforcement of the statutory limitation on parol evidence would be inequitable and unjust. *See* 73 Am.Jur.2d *Statute of Frauds* § 408; *cf. Brown,* 29 N.W. at 137, 138–39. Under this standard, Nelson has sufficiently averred facts supporting reliance on the oral service agreement and the potential for inequity to justify his invocation of the part performance doctrine in support of his breach of contract claim.

However, even assuming that the *L.U. Cattle* standard is the wisest articulation of the part performance doctrine, I believe that the majority applied that standard incorrectly. The court of appeals held that "any actions [Nelson] did take in selling the dealerships related to the terms of the signed, written agreements, and not to the terms of the alleged oral agreement." *Nelson,* slip. op. at 6. The majority agrees, holding that "Nelson's conduct in selling the dealerships . . . does not meet the requirement of the part performance doctrine that the conduct be fairly referable to no other theory besides

that allegedly contained within the oral agreement." Maj. op. at 109.

Neither the court of appeals nor the majority addresses two major contentions that Nelson argued in his response to Elway's summary judgment motion. First, Nelson's verified statements include the assertion that he sold the dealerships and land upon which they sat at "prices far below the [market] value of those assets." Although Nelson's general execution of the buy-sell agreements and real estate contracts may be attributable to the documents themselves, Nelson's specific agreement to sell the dealerships at a below-market value without additional compensation is conduct that cannot be attributed solely to those documents. Second, Nelson avers that the service agreement required the creation of a new consulting corporation, and that Nelson took steps to form that new corporation. Nelson supported this representation in an affidavit attached to his response to Elway's summary judgment motion:

Pursuant to the Service Agreement, I selected a corporate name under which to perform services under the side deal, and was in the process of incorporating under that name in the State of Texas. I provided information regarding the new corporation to my attorney, so that the Agreement he was formalizing could be drawn up in the name of the new corporation.

On review of Elway's summary judgment motion, the trial court never discussed the question of a below-market price. As for Nelson's efforts to establish the consulting corporation necessary to implement the side agreement, the court simply ruled in conclusory fashion that "[s]uch nebulous action on Nelson's part does not constitute part performance."

Considering the foundation for Nelson's assertions in the record, the questions of (1) whether the property was indeed sold for below-market values, and (2) how extensive Nelson's efforts were to establish the corporation necessary to implement the side agreement, both constituted issues of material fact that were in dispute and therefore unsuitable for resolution by summary judgment. *See, e.g., Jafay,* 848 P.2d at 903.

Assuming Nelson's version of these two disputed factual issues to be true for summary judgment purposes, *see, e.g., Cung La,* 830 P.2d at 1009, Nelson's actions in both selling the property at below-market rates and organizing the corporation necessary to implement the side agreement were unattributable to any theory other than that of partial performance of the service agreement, and Nelson's breach of contract claim should not have been precluded by the statute of frauds under the standard reiterated in *L.U. Cattle. See L.U. Cattle,* 714 P.2d at 1347–48.

## V.

In a cross-petition, Elway contends that the court of appeals erred in reversing the trial court's dismissal of Nelson's promissory estoppel claim on summary judgment grounds. Elway urges this court to adopt section 91 of the Restatement (Second) of Contracts, and hold that the conditional nature of a promise precludes a promissory estoppel claim as a matter of law. *See* Restatement (Second) of Contracts § 91 (1979). The majority accepts the invitation to adopt section 91, and as a matter of law reverses the court of appeals' determination that Nelson's promissory estoppel claim should survive Elway's summary judgment motion. Maj. op. at 109. Because section 91 is a limited exception based on reasonableness, and the parties are in dispute as to the contingent nature of the service agreement and the reasonableness of relying on that agreement, I would affirm the court of appeals' ruling and allow Nelson's promissory estoppel claim to proceed in view of the disputed issues of material fact.

Colorado law affords plaintiffs the opportunity to present promissory estoppel claims. *See, e.g., Vigoda v. Denver Urban Renewal Auth.,* 646 P.2d 900, 905 (Colo.1982); *accord Kennedy v. William R. Hudon, Inc.,* 659 F.Supp. 900, 905–06 (D.Colo.1987) (federal court adopts promissory estoppel principles in applying Colorado law). This court has adopted the doctrine of promissory estoppel, as outlined in Restatement (Second) of Contracts section 90. *Vigoda,* 646 P.2d at 905; *see also* Restatement (Second) of Contracts § 90 (1979). The purpose of promissory estoppel is " 'to keep remedies abreast of increased moral consciousness of honesty and fair representations' " in business dealings. *Vigoda,* 646 P.2d at 905 (quoting *Peoples Nat'l Bank v. Linebarger Constr. Co.,* 219 Ark. 11, 240 S.W.2d 12, 16 (1951)); *cf. Kiely v. St. Germain,* 670 P.2d 764, 767 (Colo.1983) ("The doctrine of promissory estoppel encourages fair dealing in business relationships and discourages conduct which unreasonably causes foreseeable economic loss because of action or inaction induced by a specific promise."). As the majority states, maj. op. at 109–110, the elements of a promissory estoppel claim are: (1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise. *Chidester v. Eastern Gas & Fuel Assoc.,* 859 P.2d 222, 224 (Colo.App.1992); Restatement (Second) of Contracts § 90 (1979). The lack of a written contract will not defeat a promissory estoppel claim that satisfies the elements of section 90. *See Kiely,* 670 P.2d at 767; *Chidester,* 859 P.2d at 224.

The court of appeals concluded that Nelson supported his promissory estoppel allegation in an affidavit filed with the court. *Nelson,* slip. op. at 11–12. As summarized by the court of appeals, Nelson's affidavit stated that:

(1) on March 15, 1991, the parties reached an agreement with respect to all of the terms of the Service Agreement; (2) on April 2, 1991, GMAC insisted that [Nelson] sign the keeper letters; (3) on the evening of April 2, 1991, he contacted Buscher by telephone to reaffirm the portion of the Service Agreement pursuant to which he would receive significant compensation for the sale of the dealerships; (4) Buscher assured Nelson he would be compensated as provided for in the Service Agreement; (5) in reliance on Buscher's representation, he signed the keeper letters; and (6) by signing the keeper letters he irrevocably committed himself to completing the sale of the dealerships and lands to defendants

and had no alternative except to proceed to closing.

*Id.* The majority never addresses the substance of Nelson's promissory estoppel claim, ruling instead that the claim was precluded as a matter of law under section 91 because it was based on an oral service agreement that was allegedly contingent in nature. Maj. op. at 109. The alleged oral service agreement itself contained no contingency provisions. Even assuming, however, that the contingency clauses of the buy-sell agreement are imported into the service agreement, I would hold that section 91 is a limited exception to the promissory estoppel provisions outlined in section 90, and that the section 91 qualifier is potentially inapplicable where the parties disagree over the contingent nature of a contract and the reasonableness of relying on that allegedly conditional promise. Considering the parties' dispute over the contingent nature of the alleged oral service agreement, section 91 is not preclusive as a matter of law and material factual issues remain in dispute.

Nelson's reliance on the promise of the alleged oral service agreement must be reasonable for promissory estoppel purposes. *See, e.g., Kiely,* 670 P.2d at 767; Restatement (Second) of Contracts § 90 (1979). Section 90 requires that the promisor "reasonably expect" the promise to induce action or forbearance on the part of the promisee or a third person. Restatement (Second) of Contracts § 90 (1979). Toward this end, section 91 precludes consideration of conditional promises for promissory estoppel purposes:

> If a promise within the terms of §§ 82–90 is in terms conditional or performable at a future time the promisor is bound thereby, but performance becomes due only upon the occurrence of the condition or upon the arrival of the specified time.

Restatement (Second) of Contracts § 91 (1979). The majority correctly points out that section 91 cannot be read in a vacuum, and that "[s]ection 91 interlocks with section 90, and relates to the *reasonableness* of the plaintiff's change of position based on promises of the defendant." Maj. op. at 110 (emphasis added).

However, I cannot agree with the majority that an allegedly conditional promise precludes a promissory estoppel claim under all circumstances as a matter of law. Maj. op. at 109. Because the preclusive effect of section 91 hinges on the reasonableness of the reliance, courts should consider the alleged contingency to determine whether the promisor would "reasonably expect" the conditional promise to nevertheless induce action or forbearance on the part of the promisee. *See* Restatement (Second) of Contracts § 90 (1979). Indeed, courts typically consider the conditional nature of a promise by examining the context in which the promise was made. *See, e.g., Chipokas v. Hugg,* 477 N.W.2d 688, 691 (Iowa Ct.App.1991). In fact, Elway concedes in his reply brief that "the Elway Defendants do not dispute that the context and language of the promise should be considered."

The buy-sell agreements that the parties signed in this case contained a clause requiring GMAC approval and consent regarding:

> (i) BUYER'S purchase of the Dealerships and the Real Property and (ii) floor plan financing by GMAC or another financing source and capital financing from such source in such amounts as may be required by the Factory and on such terms as are reasonably acceptable to BUYER.

Assuming that the contingency clause in the buy-sell agreements can be imported as a condition of the service agreement, the parties disagree as to the conditional nature of the contract. Elway contends that GMAC approval was a dispositive contingency. Nelson argues that GMAC approval of Elway as a buyer was never in question, that the contingency provisions of the buy-sell agreement were unrelated to the question of Nelson's personal compensation, that Nelson received assurances from Rodney L. Buscher that the service agreement would be honored without qualification, and that Elway and Pico colluded to precondition GMAC approval on a disavowance of the service agreement. Under these circumstances, the parties disagree over both (1) the contingent nature of the service agreement as a practical matter, and (2) the reasonableness of relying on the

promise contained in the oral service agreement in view of the alleged contingencies.

The court of appeals was correct in determining that genuine issues of material fact precluded the entry of summary judgment on Nelson's promissory estoppel claim. *Nelson,* slip op. at 11–12. Nelson and Elway disagree as to the existence of a service agreement, the contingent nature of the service agreement and the reasonableness of relying on that agreement, and whether Elway colluded with Pico in soliciting GMAC's preconditions. In view of these disagreements, the parties continue to assert competing factual constructions and the resolution of their dispute should not be made in a summary judgment proceeding. *See, e.g., P–W Investments, Inc. v. City of Westminster,* 655 P.2d 1365, 1372 (Colo.1982) (reasonable reliance is a question of fact). For these reasons, Nelson's promissory estoppel claim should be reviewed on the merits after a neutral factfinder has an opportunity to review all of the evidence in this case.

## VI.

In short, this case is singularly inappropriate for resolution in a summary judgment proceeding. First, there is adequate support in the record for Nelson's allegation that Elway colluded with Pico to undermine Pico's fiduciary duty to Nelson. Elway's alleged actions satisfy the unlawful act element of a civil conspiracy claim as a matter of law, and there are contested issues of material fact in this regard that must be resolved in order to determine the merits of Nelson's civil conspiracy claim.

Second, neither the merger clauses in the parties' buy-sell agreements nor the statute of frauds precludes Nelson's breach of contract claim for summary judgment purposes. At base, the parties are embroiled in a dispute regarding whether they intended the buy-sell agreements to be fully integrated and whether they intended the service agreement to be enforced. Nelson again supported his factual construction in the record, and as a result the parties' disagreement over the factual issues of integration, inducement and part performance cannot properly be resolved by summary judgment.

Finally, the court of appeals was correct in determining that material issues of fact remain in dispute regarding Nelson's promissory estoppel claim. *Nelson,* slip op. at 11–12. Because the applicable Restatement sections revolve around the reasonableness of relying on an allegedly contingent promise, and where, as here, the parties disagree over both the contingent nature of the agreement and the reasonableness of relying on that agreement, the factual issues in dispute make the claim inappropriate for resolution by summary judgment.

For the aforementioned reasons, I respectfully dissent. I would reverse the judgment of the court of appeals upholding dismissal of Nelson's civil conspiracy and breach of contract claims, and would affirm the judgment of the court of appeals overturning the trial court's dismissal of Nelson's promissory estoppel claim.

KIRSHBAUM and SCOTT, JJ., join in this dissent.